[Bessemer Land & Improvement Co. v. Campbell *et al*, Adm'rs.]

# Bessemer Land & Improvement Co. *v.* Campbell *et al.*, Adm'rs.

*Action for Damages for Negligence Causing Death.*

1. *What averments in a complaint show that superintendence was entrusted by the defendant.*—Averments in a complaint that a person named was in the employment and service of the defendant, that he had superintendence entrusted to him, and that he was negligent while in the exercise of such superintendence, and that he was the defendant's superintendent, clearly show that the superintendence which he had was entrusted to him by the defendant.

2. *Negligence; specific acts of, not necessary to aver.*—Averments of specific negligence are not required in a complaint brought to recover damages for injury resulting from the negligence of the defendant.

3. *Same; matter of inquiry for the jury.*—In a suit brought by an administrator against a mining company to recover damages for the death of his intestate, caused by the negligence of the defendant, there were tendencies of the evidence which showed that the intestate, while in the employment of the company and working in its mine, came to his death as a consequence of a fire which originated in the mine several hundred feet above him; that there were openings to the mine through which the heat and smoke and gases by which he was killed, could escape to the surface, and were so escaping until the openings were closed by order of the defendant's superintendent, who had the mine in charge; that had these openings remained the intestate might have survived for some indefinite time, during which the means to extinguish the fire might have been procured. *Held*, that the inquiry was peculiarly one for the jury as to how long the intestate might have lived in the mine after the fire, had the openings not been closed; and to enable them to say whether the superintendent was at fault in not procuring the means to extinguish the fire by other process than smothering it out, and smothering, it may be, the intestate's life out along with it, the court properly admitted the evidence that such means could have been procured; and properly permitted this evidence to take a wide range.

Nol 121.

[Bessemer Land & Improvement Co. v. Campbell, *et al.*, Adm'rs.]

4. *Diligence; highest possible, required to preserve human life.*— Where human life is at stake the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties and expense, and the person on whom the duty of action rests does not discharge it by using only the means immediately at hand.

5. *Liability of employer for the acts of his superintendent.*—The. liability of an employer cannot be measured by the peculiar temperament of his employé . superintendent, causing the . superintendent to become excited in moments of danger; but it is the duty of the superintendent to do what an ordinarily careful and prudent man would do under the same circumstances; and the employer is liable if the superintendent fails to do this and injury results to an employé.

6. *Authority of superintendent; presumed to be commensurate with his duties.*—It is a presumption that the superintendent of a mining corporation has deputed to him all the powers and authority necessary to a proper discharge of the duties imposed on him; it is his manifest duty to extinguish a fire in the company's mine in a manner best calculated to save human life, and *prima facie* he has the correlative authority to provide means to that end.

7. *Charge; when made abstract.*—If a charge is given at the request of the plaintiff, and afterwards a charge is given at the request of the defendant, eliminating from the case the count of the complaint on which the first charge is based, the most that can be said is that the first charge was abstract—an infirmity not demanding a reversal.

8. *When the court may assume the existence of a relation between parties.*—Where the fact that a person was the defendant's superintendent was proved over and over again on the trial and by his own evidence, and in no way denied or at all disputed, it is no ground for reversal that the court, in some of the instructions, assumed the existence of the relation.

9. *Superintendent; cannot avoid responsibility for his employer by consulting operatives.*—If due care and diligence demanded another course than the one taken by the superintendent of a mine in extinguishing a fire, his employer cannot avoid responsibility by evidence that the superintendent consulted the operatives and acted on their advice.

10. *A person in danger of his life from negligence of another; the care he must use.*—A person placed in danger of his life by the negligent conduct of another, is not absolutely bound to escape if there is time for him to do so, but only to do what a man of ordinary care and diligence would do to escape under the circumstances,

11. *Damages; amount recoverable.*—The amount he would have contributed to the support of his dependent next of kin, is not the limit of recovery in a suit for negligent killing an employé, if the evidence tends to show that he saved a part of his wages after paying the living expenses of himself and those dependent on him.

12. *Evidence proper to determine earning capacity.*—Where on the question of damages in an action for negligence, causing death, it was in evidence that the deceased was a strong, healthy, sober and industrious young man, a regular worker and an experienced miner, in determining his earning capacity the defendant could not have been prejudiced by evidence that an average miner, "in good health and strength and industry, could dig from five to nine tons of coal a day at those mines at that time."

13. *Evidence proper under charge of negligence.*—Evidence was properly received to show the feasibility of getting water in a certain way to extinguish a fire, under a complaint which charged negligence in not extinguishing the fire in a manner to save human life.

APPEAL from the City Court of Birmingham.

Tried before the Hon. H. A. SHARPE.

J. N. Campbell and Eliza Reevers, as the administrators of Henry Reevers, sued the Bessemer Land & Improvement Co. for damages for the death of the latter, caused, as alleged, by the negligence of the company. The pleas were the general issue and contributory negligence. The latter defense was presented in different forms by several distinct pleas; but the pleadings and rulings thereon are fully stated in the opinion. For a clear understanding of the case a description of the situation at the mine before and at the time of the death of the intestate is necessary. The defendant company was the owner of a coal mine at Belle Ellen, in Bibb county, in which the intestate met his death while working therein as a miner. The main entry to the mine was a slope of dimensions 14x6 feet, which went into the ground at an angle which was not too great to prevent entry and exit from the mine by walking. On each side of the slope were headings or entries, running at right angles to the slope. These were passages on the sides of which and at right angles to them were rooms in which the miners

dug coal. At about 20 feet from the slope and running parallel to it, there was what was called an "air course." At the place where this air course emerged to the surface was an air shaft over which a fan was operated by steam power. The intention of this fan and the effect of its operation, were to create a vacuum in the air course so that the air entering from the slope would pass through the mine, thus supplying the workmen with .pure air, and back through this vacuum created in the air course. The air course was of dimensions 8x6 feet and was connected with the slope at the bottom of the mine. The slope was called the "in-take" and the air course the "'out-take" of the mine. The connection between the slope and the air course was a cross cut from one to the other which was called a "dog hole." The plan in mining was that when a sufficient depth had been reached by the slope or main entry to cut a "dog hole"' through to the air shaft, and when the slope was further extended to close up the first "dog hole" and open another at the end of the extended slope, and so on as the mine was deepened. The closing of the "dog hole" was by a "brattice," which is a plank barricade consisting of two layers of plank extending across the opening with dirt packed between. While the Belle Ellen mine was in operation and the miners, including the intestate, were at work, about nine or ten o'clock in the day, a fire was discovered at a brattice about five hundred feet from the opening of the mine, and above the place at which the intestate was at work about six hundred feet. The superintendent of the mine was at work at the engine house when he was informed that the fan house was on fire. He immediately ordered the fan to be stopped, if the fan house was on fire. He did not go to the fan house, but learning that the fire was in the mine, went immediately there. The person to whom the order was given to stop the fan did turn off the steam from it, but testified that the steam was shut off but a very short time, and that the fan never ceased to revolve. There was conflicting evidence on this point; and the fact of the stoppage of the fan and the effect of stopping it on the fire and on the supply of air to the mine, were disputed issues in the cause. The superintendent, Johns,

went into the mine and attempted to have the fire extinguished by pouring on it such water as was accessible. There was a want of sufficient water. Failing to extinguish the fire and driven from it by the smoke and steam from a bursted steam pipe, Johns and others left the mine. Cars were run into the mines some three or four times by means of wire rope, in the hope of their reaching the miners below the fire; but whether they were gotten below the fire is uncertain. The last time they were sent down they returned on fire. The superintendent, being uncertain what to do, consulted a number of the miners, all of whom, perhaps, advised that the mine be closed; that nothing further could be done to save the men below; and that this was the only course to prevent the mine from being burned up. The slope and air course were bratticed up. The testimony showed that there was no supply of water available and no hose or pipes by which if had it could have been conveyed to the fire. There were piping and hose at Birmingham, sixty miles away, but they were not ordered by the superintendent. The contested points were, whether it was proper to stop the fan; whether it was in fact stopped; whether the stoppage of it would or did impair the chance of the men in the mine to escape; whether the sealing up of the slope and air course at the time they were sealed, could have contributed to the death of the men in the mine, or whether they must have been dead already; whether it was the duty of the superintendent, Johns, to send to a distance for hose and piping; whether it was possible to send and get them in time to save the men in the mine under the circumstances then existing; whether the intestate was notified of the fire in time to have escaped, and could have escaped by ordinary care and prudence; and whether if hose and pipe had been at hand or could have been procured in time, the water supply was such or could have been made such as to render them useful in extinguishing the fire in time to save the men. There was evidence, disputed, however, that the intestate was notified of the fire in time to escape, and straightened up as if preparing to leave the mine. The superintendent, Johns, was also a shareholder in the mine.

Charge 2 refused to the defendant was, "If they believe from the evidence that the fan over the air course was stopped by persons not acting under any order from the defendant's superintendent, L. W. Johns, then the jury must find for the defendant under the eighth count."

Charge 4 also refused to the defendant was, "If the jury believe from the evidence that the intestate knew of the existence of the fire in the mine in time to have escaped therefrom and failed to do so, then the jury must find for the defendant."

Verdict and judgment for the plaintiff. Damages $2,000.00.

WALKER PERCY, for the apellant, cited *L. & N. R. R. Co. v. Markee*, 103 Ala. 174.

BOWMAN & HARSH and CAMPBELL & THOMAS and C. P. BELDON, *Contra.*, cited *Woodward Iron Co. v. Herndon*, 114 Ala. 214; *S. & N. Ala. R. R. Co. v. Thompson*, 62 Ala. 500; *Oxford Lake Line Co. v. Chewning*, 101 Ala. 376; *Ensley R. R. Co. v. Chewning*, 9 Ala. 24; *Leach v. Bush*, 57 Ala. 153; *Laughran v. Brewer*, 113 Ala. 514; *Smith v. Houston*, 78 Ala. 576; *A. G. S. R. R. Co. v. Tapia*, 94 Ala. 226.

McCLELLAN, C. J.—The complaint originally contained ten counts. Demurrers were sustained to some of them, and upon the rest except four the affirmative charge was given for the defendant. Those upon which the verdict for plaintiff was rendered, are the 6th, 7th, 8th and 9th. The 6th count is as follows: "Plaintiff [J. N. Campbell as administrator of the estate of Henry Reevers, deceased,] claims of the defendant fifteen thousand dollars as damages for that heretofore, to-wit, on 15th day of September, 1897, defendant was running and operating a coal mine at or near Belle Ellen, in Bibb county, Alabama, and on said day plaintiff's intestate was in the service or employment of the defendant in or about said business of the defendant, and while said intestate was in said mine in and about said business as aforesaid, a fire broke out or was burning in said mine, and said fire caused smoke, or gases other than

air to be in said mine in such quantity or density that said intestate was suffocated or asphyxiated, so that as a proximate consequence thereof he died. And plaintiff further avers that his said intestate was suffocated or asphyxiated and his death was caused as aforesaid as a proximate consequence, and by reason of the negligence of a person in the service or employment of the defendant, who had superintendence intrusted to him whilst in the exercise of such superintendence, viz., defendant's superintendent or bank boss, to-wit: *L. W. Johns, negligently failed to take due and proper precautions to prevent said fire from causing said suffocation or asphyxiation and death of plaintiff's intestate.*"

The only difference between this count and the 7th, 8th and 9th is in respect of the averments of the negligent acts and omissions of said L. W. Johns, which we have italicized above. The averment in the 7th count is that said Johns "negligently caused or allowed said smoke or gas, other than air, to be in or be conveyed to that part of said mine where plaintiff's intestate was as aforesaid." In the 8th it is that Johns "negligently caused or allowed the ventilator fan of said mine to be shut down or stopped too soon after the said fire was discovered." And in the 9th count it is averred that said Johns "negligently caused the mouth or openings of said mine to be closed after said fire was discovered and while plaintiff's intestate was in said mine." Defendant demurred to each of these counts on the grounds, (1) "it is not averred in any of said counts that the defendant intrusted said L. W. Johns with such superintendence, and (2) that "the specific negligence which it is alleged said L. W. Johns is guilty of is not sufficiently set out in any of said counts." The demurrer was overruled; and that action of the trial court is presented for our consideration.

Each of these counts avers that Johns was in the employment and service of the defendant, that he had superintendence intrusted to him, and that he was negligent while in the exercise of such superintendence, and that he *was the defendant's superintendent* or bank boss. We do not think it requires discussion to demonstrate that any fair construction of these averments

leaves no room to doubt that the superintendence which the defendant's superintendent had was entrusted to him by the defendant. *Woodward Iron Co. v. Herndon, Admr.,* 114 Ala. 191, 214-15.

In the averment of the negligence of the superintendent, Johns, each of the counts—even the 6th—is sufficient under the rule which has been too often declared by this court and has been too long established to be now departed from; the averment of specific negligence is not required. *Ga. Pac. R'y Co. v. Davis,* 92 Ala. 307; *Laughran v. Brewer,* 113 Ala. 509, 514-15, and cases there cited.

A fire in a coal mine is not a thing for an hour or a day. It may burn for days and weeks and months. And a fire, it is inferable upon some tendencies of the evidence in this case, may be so located in the mine with reference to the slope, the air course, the entries and chambers as that persons in recesses of the mine beyond it may survive for some indefinite time while the conflagration is raging in a part of the mine. How long life could be sustained when the fire begins half way down a six or seven hundred feet slope in the brattice of a cross-cut leading into the air course and immediately burns through the brattice thus facilitating to a greater or less extent the carrying off of the heat, smoke and gases through the air course and away from the lower reaches of the mine, where persons are imprisoned, is not shown in this case, and in the nature of things could not be with any approach to definiteness. A witness testifies that a man could not have lived in there more than an hour and a half under any state of facts supported by tendencies of the evidence. This was his opinion as a mine expert, but it was conjectural at best, and weakened by other opinions expressed by this witness which were in conflict with common knowledge. With unobstructed ingress and egress of air down the slope to the fire and then up the air course, it would seem that the exhaustion of oxygen in the air below the fire would be slow indeed. And so too the filling of the lower spaces with smoke and gases. And under these circumstances a man in the mine three or four hundred feet below the fire might live for several days, so far as smoke and gas

coming down on him and the sterilization of the atmosphere around are concerned. Of course he would have less time if the opening at the fire into the air course was too small for the passage of all the hot air and smoke produced by the fire, and of course too his span of life would be further abridged by the spread of the fire toward him. And then too if the fire attacked the brattice on the side next the slope there must have been some time before that was burnt through and a passage there made for the smoke and gases into the air shaft, and while this state of things continued the smoke would have naturally gone down the slope until it reached the lower end of the air course, thus tending to fill the mines at once. But it is not certain that the fire began on the slope side of the brattice. There is evidence that more headway was made by it in the air shaft than in the slope; and it is a fact of some pregnancy that the men working in the entries below the fire were not warned of its existence by smoke coming down there, but had to be called away by a person sent down into the mine some time after the inception of the fire. It further appears that they experienced no difficulty with the smoke until they reached the point of the fire as they came up the slope, and it does not appear that the person sent to them had any difficulty with smoke opposite the point of the fire as he went down to the men, all of which affords grounds for an inference to be drawn by the jury that the fire originated in the air shaft and that smoke got into the slope only after the brattice had been burned through from the shaft, and of course that from the moment there was any fire in the slope there was exit from it for the smoke into the air shaft. And it appears to be certain that the air course was belching smoke before there was any indication of it in the lower part of the mine. We refer to these several tendencies of the evidence, in consonance with which the jury might have found the facts, to demonstrate the uncertainty that must necessarily have hedged about the inquiry as to how long the intestate lived in the mine after the fire, or rather might have lived had the slope and air course been left open, and as a basis for our conclusion that that inquiry was peculiarly one for the jury. The court

could not have been justified in fixing any definite limit
to the period the intestate would have survived if the
mine had been left open. It could not have assumed
that he would have died in a day or two or three days or
a week, nor could it have assumed, of course, that the
jury would find that he could not have lived long enough
for the means adequate to his rescue to have been pro-
cured and used. The whole matter was for the jury;
and to enable them to say whether Johns was at fault in
not procuring the means to extinguish the fire, by other
process than smothering it out and smothering may be
the intestate's life out along with it, the court properly
admitted the evidence tending to show that such means
could have been procured. And it is no objection to
this evidence that it went far afield. If Reevers' life
could have been saved by telegraphing to New York or
to Chicago for hose with which to flood the fire, it was
upon the defendant's superintendent to so telegraph and
have the appliances sent by express. And so, if that
would have met the occasion, he should have telegraphed
to Birmingham, sixty miles away, where such appliances
were generally kept, and, if need had been, have had
them sent out by a special train. Where human life is
at stake the rule of due care and diligence requires every-
thing that gives reasonable promise of its preservation
to be done regardless of difficulties and expense. The
person upon whom the duty of action rests does not dis-
charge it by using only the means immediately at hand.
If a man is in a place where he will sooner or later be
burned to death, and the person upon whom rests the
duty of rescue has not at hand a bucket of water with
which to extinguish the fire and save the life, but there
is time for him to go and get it, he must go and get it.
If it is necessary and there is time for him
to go a mile for it, he must go that mile for
it. Or if a man is lashed to the top of a tree and like to
starve to death, the person whose duty it is to save him
cannot excuse himself because he has no ladder; he must
fetch one, and he must go as far as is necessary to fetch
one within the time the man may survive. In the case
we have, it being for the jury to find how long Reevers
would have survived had the slope and air shaft not been

bratticed up, it was proper to lay before them evidence tending to show what Johns might have done during such time towards providing means adequate to his rescue.

We do not understand that an employer's liability for the negligent act of his superintendent can be measured by the latter's poise of temperament, nor that the character of a given act of the superintendent in respect of negligence can be made to depend upon his excitability or the reverse. It is the duty of a superintendent to do what an ordinarily careful and prudent man would do under the same circumstances, and the employer is liable if he fail to do this and injury results to an employé. To hold, as we are urged to do by counsel for appellant, that there can be no liability where the duty has been neglected because of supersensitiveness of the superintendent's nervous system would be to allow employers generally to escape the burden the statute puts upon them by employing superintendents who are especially excitable and given to losing their heads on important occasions. There is a well established doctrine, applicable mainly if not entirely under pleas of contributory negligence, to the effect that where a party has been suddenly placed in a position of extreme peril, and threupon does an act which under the circumstances known to him he might reasonably think proper, but which those who have knowledge of all the facts and time to consider them, are able to see was not in fact the best, he will not be held to have been negligent in so acting; but, as indicated in this statement of the proposition, and as has been expressly ruled by this court, his conduct even in such case is measured by the standard of the care and prudence an ordinarily careful and prudent man would have exercised under the circumstances. Thus we have said: "The fact, if it be one, that the intestate was panic-stricken and his energies paralyzed by the awful nature of the impending catastrophe, might be proper to be considered by the jury in determining what effort amounted to due diligence, or what omission of effort would be negligence under all the circumstances; but no such consideration can relieve from the duty of diligence on the one hand, or condone negligence

on the other." *Holland v. Tenn. Coal, Iron & Railroad Co.,* 91 Ala. 444, 454. We are not aware that this doctrine has ever been applied to a defendant's superintendent; and there is no predicate for its application in any case in the absence of personal peril to the party seeking to have his conduct measured by reference to it. But, however all that may be, the defendant here was not entitled to a more favorable rule than that laid down by the trial court, holding Johns to the same care and diligence that would have been exercised by a man of ordinary care and prudence under the same circumstances. The law cannot take any account of those personal idiosyncracies of a superintendent which tend to perturb him on occasion beyond ordinary men.

There is a presumption that the superintendent of the mining operations of a corporation has deputed to him all the powers and authority necessary to a proper discharge of the duties imposed upon him. It is his manifest duty to extinguish a fire in the company's mine in a proper manner, and *prima facie* he has the correlative authority to provide means to that end. This presumption concurs with all the evidence in this case to the conclusion that Johns had authority to purchase and procure the necessary appliances to extinguish this fire; and the court below was not at fault in assuming the existence of such authority.

Most of the rulings of the city court to which exceptions were reserved are referable to and supported by the foregoing views. Those that are not we will discuss separately.

The usual order observed in submitting requests for instructions to the trial judge is for the plaintiff's requests to be first submitted and granted or refused, and then those of the defendant. We presume that order was observed on the trial of this case. Therefore when charge 2 was given for plaintiff in respect of Johns' supposed fault as to the inception of the fire, the affirmative charge for the defendant as to the 4th count had not been given and that count was still in the case. On this state of the record the most that can be said of that charge (2) is that it was abstract, and this infirmity will not require a reversal of the judgment.

The fact that Johns was defendant's superintendent was proved over and over again on the trial and by his own evidence, and in no way denied or at all disputed. The fact that the court in some of the. instructions assumed the existence of this relation cannot be ground for reversal.

It was in evidence that Johns consulted the operatives as to the expediency of bratticing up the mines and that they expressed the opinion that that was the best thing to be done. Very clearly this did not make it the best thing to be done, nor relieve Johns from the duty of taking some other course if in the exercise of due care and diligence another course should have been pursued. He could not in this way shift the responsibility which was upon him.

The complaint charges that Johns negligently caused *or* allowed the fan to be stopped too soon. If it was not stopped at his order, but he *allowed* it to be stopped the averment of the count is proved. Charge 2 refused to defendant was therefore too narrow.

Charge 4 refused to defendant would have exacted too high a degree of diligence from Reevers. He was not absolutely bound to escape if there was time for him to have escaped, but only to do all that a man of ordinary care and diligence would have done under the circumstances to escape. It is fallacious to say that because his life depended on it he was bound to exercise the highest possible degree of diligence and care and to make no mistakes in the methods he adopted to save his life. The rule is one of ordinary and reasonable care at all times, regardless of what the threatened consequences are; and it may be on a principle referred to in another part of this opinion that the awful character of the impending danger, the imminency of loss of life, itself shaded the general rule, or rather was to be taken into account by the jury favorably to the plaintiff in determining what a man of ordinary care and prudence would have then and there done.

There was evidence in the case tending to show that Reevers saved a part of his wages after paying the living expenses of himself and those dependent upon him. It would therefore have been error for the court to limit

the recovery to the amount he would have contributed to the support of his dependent next of kin.

The testimony of the witness, John White, that "at the time the bratticing was begun the fire must have been on the slope and air course" was obviously a mere conclusion of the witness, and was properly excluded; as was also the statement of the witness McCall: "I am satisfied the return air course was on fire," and the proposed testimony of the witness Johns that "at the time he bratticed up the mine there was nothing he could have done to save the men," and "that it was not practicable to put out the fire except by bratticing up the mines with the appliances we had." These statements of Johns covered indeed the very issues which the jury were trying.

It was in evidence that Reevers was a strong, healthy, sober and industrious young man, a regular worker and an experienced miner. In determining his earning capacity the defendant could not have been prejudiced by the evidence that an average miner "in good health and strength and industry, could dig from five to nine tons of coal a day at those mines at that time." If that is any inaptness in the comparison it is unfavorable to the plaintiff.

The fact that before the fire there had been a pipe line extending from the mine to Cahaba river, a distance of a mile and a half, tended to show the feasibility of getting water through that line if it still existed, or through a line to be relaid there if it had been taken up, in time to extinguish the fire in that way while the intestate still survived; and evidence was properly received of the fact.

The testimony of Duncan as to the inspection he had made, etc., etc., was competent under counts then in the case.

The judgment must be affirmed.