# Walker *v.* Birmingham Coal & Iron Co.

### *Injury to Servant.*

(Decided May 8, 1913. Rehearing denied December 18, 1913. 63 South. 1012.)

1. *Statutes; Construction; Legislative Intent.*—Statutes designed to protect human life should be so construed as to effectuate the legislative intent.

2. *Master and Servant; Regulating Mines; Statutes.*—The provisions of section 1016, Code 1907, imposes an imperative duty on the operator or superintendent of a mine to so ventilate the mine as to render it harmless from noxious gases generated therein.

3. *Same.*—Section 1016, Code 1907, imposes the duty to prevent an accumulation of noxious gases generated in the mine, but does not make the operator or superintendent an insurer against gases released or entering into the mine from their natural habitat by moving layers of coal which form the gas pocket.

4. *Same.*—The liability of an owner of a coal mine for the death of an employee by an explosion of gas in a mine occurring while section 1016, Code 1907, was in force, is governed thereby, and not by provisions of Acts of 1911, section 40, p. 515, which recognizes a distinction between noxious and explosive gases, and includes both.

5. *Same; Validity.*—The provision of section 1016, Code 1907, when construed as imposing an imperative duty to so ventilate mines as to

render them harmless from noxious gases generated therein, is a valid exercise of the police power and is not so arbitrary or oppressive as to render it repugnant to the Federal Constitution.

(Mayfield, Sayre and Somerville, JJ., dissent.)

APPEAL from Birmingham City Court.

Heard before Hon. CHARLES W. FERGUSON.

Action by Mary Walker, administratrix of Jesse Walker, deceased, against the Birmingham Coal & Iron Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

The death was occasioned by an explosion in a coal mine, and the negligence is alleged in various ways under subdivision 1 and 2 of the Employers' Liability Act (Code 1907, § 3910). In a failure of defendant to provide ample means of ventilation for the circulation of air through the main entrance and all other working places, to an extent that it would dilute, carry off, and render harmless noxious gases, generated in said mine, and because of a failure to do so, the gases became ignited and caused an explosion which killed plaintiff's intestate.

PERDUE & COX, and WILLARD DRAKE, for appellant. However perfect the ventilating apparatus might have been, yet if it was not such that it would dilute, carry off and render harmless the noxious gases generated in the mine, defendant would be liable as for a violation of duty.—Sec. 1016, Code 1907; *Sloss-S. S. & I. Co. v. Sharpe*, 47 South. 280; *Pratt C. C. Co. v. Davidson*, 55 South. 888; 161 Ala. 643. On these authorities, the court erred in its rulings on the admissions of evidence, and in the charges given for defendant. The violation of a statutory duty is negligence.—*K. C. M. & B. v. Flippo*, 137 Ala. 489; *Woolf v. Smith*, 149 Ala. 463; s. c. 160 Ala. 648; *Foley v. Pioneer M. & M. Co.*, 144 Ala. 175; 152 U. S. 262.

[Walker v. Birmingham Coal & Iron Co.]

PERCY, BENNERS & BURR, TILLMAN, BRADLEY & MOR-
ROW, and BANKHEAD & BANKHEAD, for appellee. The
contention of appellant amounts to a declaration that
section 1016, Code 1907, places an absolute insurer's
duty on the operator or superintendent of a mine to
keep it free from noxious gases, and the mere presence
of gas in the mine as inferred from the explosion is suf-
ficient to make the mine owner liable for injury. As
written, the statute provides a duty to keep up or keep
in repair a proper ventilating apparatus, and the evi-
dence discloses that this was done.—33 S. W. 480; 82
N. W. 670; 52 N. E. 1022; 4 N. E. 163; 37 N. E. 862; 5
Words & Phrases, 4278; 2 N. E. 80; 40 Ga. 582; 49 L.
R. A. 625 and note; 13 Ill. App. 261; 14 South. 726.
The *Davidson Case* and the *Sharp Case* so frequently
quoted by appellant do not contravene any position of
defendant. A much closer analogy is presented by the
facts of the case as presented by *Tutwiler v. Farring-
ton,* 144 Ala. 157; *Sloss-S. S. & I. Co. v. Tripplett,* 58
South. 108; *Frederick v. Coosa Co.,* 59 South. 702. In-
competency of servants cannot be presumed.—*Conrad
v. Gray,* 19 South. 498. The doctrine of res ipsa loqui-
tur is never applied when there is any other reasonable
explanation of the injury.—*Tuck v. L. & N.,* 98 Ala. 150;
83 S. W. 889; 25 N. E. 259; 60 S. W. 270. The statute
is clear enough in its terms and needs no construction,
the duty is to follow and obey.—Endlich on Statutes, sec.
5; 341-343; 46 L. R. A. 517; 54 Pa. St. 86. The statute
should not be extended by judicial construction.—*Leh-
man-Durr & Co. v. Robinson,* 59 Ala. 219; *Reese v. State,*
73 Ala. 18. It is a well settled rule of construction
that in readopting a statute, the Legislature is presum-
ed to have known the fixed judicial construction it has
received, and to have adopted it with that construction.

—*Morrison v. Stevenson,* 69 Ala. 450; *Barnwell v. Murrell,* 103 Ala. 377; *White v. State,* 134 Ala. 202.

ANDERSON, J.—Section 1016 of the Code of 1907 says: "The operator or superintendent of every coal mine, whether shaft, slope, or drift shall provide and hereafter maintain, ample means of ventilation for the circulation of air through the main entries and all other working places to an extent that will dilute, carry off, and render harmless the noxious gases generated in the mines. It shall be the special duty of the inspector and his assistants to carry out the provisions of this section; and it shall also be the duty of each and every mine operator and mine boss to assist the inspector and his assistants in carrying into effect said provisions." This statute is not as terse and clear as it might be, but it was evidently the intention of the Legislature to require mine operators and superintendents to keep their mines ventilated to the extent of rendering them harmless from noxious gases generated therein. The Legislature meant more than merely requiring the nondelegable duty of furnishing the means for ventilation, but made it the imperative duty of the operator or superintendent to so ventilate the mine as to render it harmless from noxious gases generated therein. This seems to be the view taken of the statute in the case of *Foley v. Pioneer Co.,* 144 Ala. 178, 40 South. 273, and which case was decided before the re-enactment of the statute in the present Code. It is true that the said statute is not discussed at length in said case; but the opinion indicates very strongly that it was the imperative duty of the operator or superintendent, under said statute, to keep the mine ventilated for the purpose of carrying off and rendering harmless noxious gases generated therein. The statute was again so treated in the case of *Sloss-*

*Sheffield Co. v. Sharpe,* 161 Ala. 432, 50 South. 52, and 156 Ala. 284, 47 South. 279.

Statutes of this character are designed for the purpose of protecting human life and should be so construed as to effectuate the legislative intent, and this section should not be so whittled down as to make it the imperative duty of the operator to supply only the means, but so as to require that he keep his mine harmless from noxious gases generated therein.

The trial court in ruling upon the evidence and in giving certain charges, requested by the defendant, proceeded upon the idea that the statute did not require the defendant to keep the mine ventilated, but merely required it to furnish and keep the means and appliances for ventilation, and in this there was error.

The judgment of the city court is reversed, and the cause is remanded.

Reversed and remanded.

McCLELLAN, SAYRE, SOMERVILLE, and DE GRAFFEN-RIED, JJ., concur. MAYFIELD, J., dissents. DOWDELL, C. J., not sitting.

### ON REHEARING.

As stated in the original opinion, this statute (section 1016 of the Code of 1907) is not as clear as it might be, but it is reasonably susceptible of the construction given it, and which was given thereto in the *Foley Case, supra,* and, like all statutes designed for the protection of human life, should be so construed as to effectuate the beneficent purpose of the Legislature in passing same. This statute applies only to noxious gas generated in the mine and was intended to require the mineowner to fan it out, or to so ventilate his mine as

to prevent all harmful results from said noxious gas. This statute does not make the mineowner an insurer, under any and all conditions, against mine explosions, or make him liable for certain unavoidable accidents, but is confined to injuries resulting from harmful noxious gases generated in said mine, and makes it his imperative duty to prevent an accumulation of same to the extent that it must not be harmful to the miners. It does not make him an insurer against gas not generated in the mine but which is released or enters therein from its natural state by moving the layers of coal which held it in the gas pockets.

It may be that the act of 1911 (page 515, § 40) recognizes a distinction between noxious and explosive gas and includes both, and, as it prescribes the amount of air to be supplied, the owner may meet the requirement of same when he supplies the requisite amount of air, but, as this case arose prior to said last act, it must be governed by the Code of 1907, and we will construe said last act when the occasion may arise for us to do so.

The Legislature, in adopting section 1016, was exercising a police power for the protection of human life and health, and we do not think that the said statute is so arbitrary or oppressive as to render it repugnant to the federal Constitution.—*Barrett v. State of Indiana,* 229 U. S. 26, 33 Sup. Ct. 692, 57 L. Ed. 1050.

The application for a rehearing is overruled.

DOWDELL, C. J., and MCCLELLAN and DE GRAFFENRIED, JJ., concur. MAYFIELD, SAYRE, and SOMERVILLE, JJ., dissent.

MAYFIELD, J.—(dissenting).—The opinion says, and the decision decides, that a mine-operator is imperatively required by the statute quoted and construed,

to "keep his mine harmless from noxious gases generated therein"; that he does not discharge his statutory duty by providing and maintaining ample means for ventilating the mine.

If this is true, then the court ought to go further and declare the statute to be unconstitutional. The Legislature has no power to require a man to do that which he and no one else can do. Human genius, so far, has not been able to learn or devise any means to this end. If it be possible, no human being has yet discovered the mode or process of so doing. Science may hold it in store, but, so far, she has not revealed it to man—it is still a sealed book. If the Legislature can make a man do that which he cannot do, then the statute is all right; if it cannot, then it is all wrong. That is all there is, or can be, in the decision.

I say: First, the Legislature has not so provided; and, second, if it has, it is of no avail. It is both conceded and decided in the opinion that the statute is not clear to this end. It is apparent and unquestionable that the statute does not say what the court says it means, but the construction placed on it by what is said in the opinion is, that it is the imperative duty of the mineowner, and a nondelegable duty, to "keep his mine harmless from noxious gases generated therein." It is admitted that this was not the law before the passage of statute; and I suppose it will be conceded that it was never heretofore expressly so decided, though cases are cited as inferentially so deciding, and these cases this decision purports to follow. I think my Brothers are in error, as to what the cited cases decided as well as to the construction placed upon this statute.

It was expressly said by this court, speaking through the same judge and concurred in by the same judges that announced and concurred in the decision of this

identical case on the original hearing (this being a re-hearing), that the statute in question does not mean what it is now held to mean; and it has been decided by this court, in another case construing the same provision of the same statute, that it does not mean what the court now says it means; and in one of those cases the decision was reached and adhered to on both hearings, and this is probably some excuse for my being unable to agree to this decision or concur in the opinion.

On the first hearing in this case it was said: "The duty of operating the ventilating appliances is delegable; and if the master provides and maintains sufficient appliances to dilute, carry off, and render harmless the noxious gases, he complies with the statute. The word 'maintain,' as used in this section, does not mean 'operate,' and the statute cannot be properly construed so as to make the master an absolute insurer against harmful, noxious gases generated in the mine, by giving this word such a meaning. Had it been the intention of the Legislature to make the mineowner an absolute insurer, they would have said so in plainer and fewer words." I confess my inability to show the error of the present holding in stronger or plainer terms than those quoted above; and another case has been put out by this court, at this term, deciding the same thing, which I suppose will be recalled and corrected if the present decision and opinion is allowed to stand. The only thing I desire to add to the above is that it is admitted in this opinion that the statute changes the common law in this respect, and it is admitted that the statute is not clear and that it is doubtful. This being true, why does not the second canon of construction apply, that a statute will not be construed to change the common law, but to be declaratory thereof, unless the change clearly and unmistakably appears? The pres-

ent construction of this statute clearly violates this rule of construction, often stated by this and all other courts which have ever spoken on the subject.

So much for the proper construction of the statute; but if the statute means what the court says it means, and is a valid law, what is the effect and result? Many other states, and England, have similar statutes, and they have never been so construed, but, on the contrary, have been construed by the respective courts of such countries as the first opinion quoted construed them. Why should the courts of this state decide differently from all other courts? It seems to me too plain for controversy or doubt that, if this is the law, no solvent man or corporation can afford to operate a coal mine, could afford to assume the responsibility; that coal will have to be mined by insolvent persons or corporations, or by the state, which is probably not within the statute. No insurance company would insure a mine against such risk.

It is an acknowledged and well-known fact that thus far no means or device has been discovered which, even under the most careful operation, will prevent injuries and accidents in coal mines as the result of bad air and explosions. I suggest, for the consideration of any one who desires to consider the suggestion, that this particular section was not specially provided, nor intended, to prevent explosions, but primarily to afford pure air for the miners to breathe while at work. An explosion might occur, when no one would be able to detect any impurity so far as air to breathe is concerned. I desire further to call attention to the fact—which the opinion does not notice—that, if the statute means what this decision says it means, the superintendent, as well as the operator, is liable as to ventilation and explosions in coal mines. Would any prudent and solvent man ac-

cept the position of superintendent of a coal mine if he is, by the statutes, thus subjected to liabilities against which experience, care, and competency cannot provide? Did the Legislature mean to say, or did they say, that the superintendent of a mine is an insurer against accidents on account of gas generated in such mine? This is what the opinion in effect and necessarily decides. How any accident can occur in a coal mine on account of noxious gases other than those "generated in the mine" I am not able to understand. How any such "noxious gases" are in, or can be in, a mine in which they are not "generated," I cannot conceive; yet it is upon this theory only that the constitutionality of the statute can or is attempted to be sustained.

If the statute expressly and unmistakably imposed civil liability merely upon the showing of injury resulting from or proximately caused by noxious gases in the mine, then, as I understand this decision, and others of this court, the statute would clearly be unconstitutional.—*Zeigler's Case,* 58 Ala. 594. In that case, speaking of a statute against railroads, similar to this, which expressly provided what the court holds that this statute, by implication, provides, this court, speaking by Stone, J., said: "We have heretofore declared a rule which exacts from railroad corporations a high degree of skill and diligence, to prevent injury to persons and property. See *Tanner v. Louisville & Nashville R. Co.* [60 Ala. 621], *Sav. & Memph. R. R. Co. v. Shearer* [58 Ala. 672], and *S. & N. R. R. Co. v. Sullivan* [59 Ala. 272], at the present term. We have no wish to modify that rule. But when these very useful corporations conform to this strict rule of diligence, we can perceive no reason, in law or morals, for holding them to a stricter measure of accountability for inevitable misfortunes than would be exacted from natural persons for injuries

which result from unavoidable accident; or accidents which no human prudence can foresee or avert."

This doctrine was reaffirmed in *Morris' Case,* 65 Ala. 193, in the following language. "In *Zeigler v. S. & N. R. R. Co.,* 58 Ala. 594, this court pronounced the first section of this act, now comprised in section 1710 of the Code, to be unconstitutional, on the ground that it sought to impose an absolute and unconditional liability upon railroad companies, without regard to any question of legal wrong, fault, or negligence on their part, and thus operating to deprive them of a hearing in court by that 'due process of law' guaranteed to all persons under section 7 of the Bill of Rights."

The rule as stated by Mr. Labatt, as to the duty of the master to supervise the mere executive details of the work, is (Master and Servant, vol. 2, p. 1719, text and notes) : "The most general form in which the limits of a master's obligations are susceptible of being stated is that he is not bound to supervise the merely executive details of the work to be done by his servants." " 'It would be extending the liability of the master beyond any established rule, to require him to oversee and supervise the executive detail of mechanical work carried on under his employment, and there is no rule of law which authorizes it.'—*Hussey v. Coger* (1889) 112 N. Y. 614, 20 N. E. 556, 3 L. R. A. 559 [8 Am. St. Rep. 787]." "The master does not insure his employees against each other, nor is he bound to supervise and direct every detail of their labor. They must exercise their own senses in the selection of material out of the mass provided for them; they must use their own judgment as to the manner of handling it. No employer could bear the burden of legal responsibility for every blunder or neglect on the part of each and all of his employees."

I thoroughly agree with the opinion in this case as to the proposition that these statutes are intended to protect human life and to this end should be liberally construed. When human life is imperiled or endangered, I fully agree with what McClellan, C. J., said in *Campbell's Case,* 121 Ala. 50, 25 South. 793, 77 Am. St. Rep. 17, in which the intestate, Reeves, was imprisoned in a coal mine which was on fire. He there spoke as follows: "If Reeves' life could have been saved by telegraphing to New York or Chicago for hose with which to flood the fire, it was upon the defendant's superintendent to so telegraph and have the appliances sent by express. And so, if that would have met the occasion, he should have telegraphed to Birmingham, 60 miles away, where such appliances were generally kept, and, if need have been, have had them sent out by a special train. Where human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done regardless of difficulties and expense." Notwithstanding Mr. Freeman, the great annotator, said: "This, however, would seem, as a matter of law, to lay down a rule of diligence entirely too rigid and exacting to be deemed 'reasonable,' and, while the degree of diligence and care which a reasonably prudent man would exercise if confronted by a situation imperiling human life is undoubtedly very high, it is doubtful whether it can be said to require the adoption of every measure, 'regardless of difficulties and expenses.'"—87 Am. St. Rep. 566.

I concede the rule is well stated by that clearest of all judicial writers of my acquaintance, Mr. Justice Field, in *Mather v. Rillstone,* 156 U. S. 39, 15 Sup. Ct. 464, 39 L. Ed. 464, where he says: "Occupations, however important, which cannot be conducted without necessary danger to life, body, or limb, should not be prosecuted

at all without all reasonable precautions against such
dangers afforded by science.  The necessary danger at-
tending them should operate as a prohibition to their
pursuit without such safeguards.  Indeed, we think it
may be laid down as a legal principle that in all occu-
pations which are attended with great and unusual dan-
ger there must be used all appliances readily attainable
known to science for the prevention of accidents, and
that the neglect to provide such readily obtainable ap-
pliances will be regarded as proof of culpable negli-
gence."

Yet, in agreeing to all this, I am not willing to agree
to a construction of a statute which will make one man
liable for the death of another when the living one could
not have prevented the death or injury to such person,
unless that construction is undoubted and unavoidable;
and if it did so provide I should say that without doubt
such statute was unconstitutional.

A number of statutes in Pennsylvania, which attempt-
ed to make the operator liable for injuries which he
could not prevent, were held to be unconstitutional and
in violation of the Bill of Rights, and to deny due pro-
cess of law.  It seems to me too plain for argument that
any statute which attempted to make any person liable
for acts or consequences which such person could not
avoid or prevent is contrary to all morals and law.  See
*Durkin's Case,* 171 Pa. 183, 33 Atl. 237, 29 L. R. A. 808,
50 Am. St. Rep. 801.  In that case the court struck down
a statute which said, in words, what this court says our
statute implies.  The first paragraph in the opinion is as
follows:  "The first article of the Constitution of this
state, known as the Bill of Rights, declares that all men
are possessed of certain inherent and inalienable rights.
One of these rights is to acquire, possess, and protect
property.  The preservation of this right requires both

that every man should be answerable for his own acts and engagements, and that no man should be required to answer for the acts and engagements of strangers over whom he has no control. A statute that should impose such a liability, or that should take the property of one person and give it to another, or to the public, without making just compensation therefor, would violate the Bill of Rights, and would be for that reason unconstitutional and void.—*Harvey v. Thomas,* 10 Watts (Pa.) 66 [36 Am. Dec. 141]; *Ervine's Appeal,* 16 Pa. 256 [55 Am. Dec. 499]; *Kneass' Appeal,* 31 Pa. 87; *Wolford v. Morgenthal,* 91 Pa. 30; *Godcharles & Co. v. Wigeman,* 113 Pa. 431 [6 Atl. 354]. It is in furtherance of the right to acquire, possess, and protect property that section 18 of the Bill of Rights prohibits the enactment of laws that shall interfere with or impair the obligation of contracts. The tendency towards class legislation for the protection of particular sorts of labor has been so strong, however, that several statutes have recently been passed that could not be sustained under the provisions of the Bill of Rights. Such was the case in *Godcharles v. Wigeman, supra.* Such was the case with some recent provisions relating to mechanics' liens, and such is alleged by the appellant to be the case with some of the provisions of the act of 1891 (P. L. 176) under which this action was brought."