# Williamson Iron Co. *v* McQueen, as Admr.

*Action for Damages for Death of Employe.*

[DECIDED FEB. 17, 1906, 40 SO. REP. 306.]

1.  *Master and Servant; Fellow Servants; Statutory Provisions; Persons Exercising Superintendence.*—One having general superintendence at night of all of the employes engaged in operating a blast furnace, was in the exercise of superintendence under Subd. 2, § 1749, Code, 1896, so as to render the master liable for the negligence of such person while in the exercise of superintendence; so, also, was one who had charge of the special gang of men engaged in the breaking of ore to proper size and loading it into the furnace.

2.  *Same; Negligence of Superintendent; Unanticipated Results.* The master is liable for the negligence of one exercising superintendence intrusted to him, in permitting lumps of iron ore of too large size to be loaded into a furnace, thereby causing a "scaffold" to form, and the falling in of which caused the "bosh jacket" to give way, precipitating a mass of molten matter upon deceased, causing him to be burned to death, although such superintendent did not know, or was not chargeable with knowledge, that the loading of the furnace with improper material would cause the "bosh jacket" to give way.

3.  *Same; Contributory Negligence; Jury Question.*—The evidence being in conflict as to each alleged act of contributory negligence on the part of deceased, it was properly submitted to the jury to determine whether deceased was negligent, when, as general managr, he suprintended the rebuilding of the furnace and failed to provide a reasonably strong "bosh jacket;" or whether or not he permitted the use, in the furnace, of inferior coke; or in causing the blast or cast to be withdrawn

just prior to the time the slip occurred causing the giving way of the jacket.

4. *Appeal; Trial Court's Discretion; New Trial.*—Unless there appears to be palpable failure of evidence, the action of trial court, in refusing a motion for new trial, on grounds of the insufficiency of the evidence, will not be disturbed upon appeal.

5. *Trial; Instructions; Credibility of Witnesses.*—An instruction that if the jury are reasonably satisfied from the evidence that any one witness willfully swore falsely in any material particular, then the jury may disregard the testimony of that witness entirely ,is proper.

6 *Witnesses; Leading Questions.*—The question "Don't you know, with the utmost care they slip in, referring to large pieces of ore, was leading and objection to it properly sustained.

7. *Evidence; Opinion Evidence; Expert.*—It is proper to permit one shown to be an expert furnace man and builder to testify as to the condition of the furnace prior to the accident; also if he saw material that came from the furnace and its size; whether material was of sufficient thickness for a furnace of that size; and to describe the conditions of the iron in the furnace and whether it had crystalized when it broke loose.

8. *Master and Servant; Contributory Negligence; Instructions.*—An instruction that whether or not the "bosh jacket" was old, if it was reasonably sufficient for a furnace of that size, or that it appeared to deceased, in the exercise of reasonable care, that it was reasonably sufficient, and he was a reasonably prudent mn, he could not be charged with contributory negligence, even if greater strength in the jacket would have prevented deceased's death, was properly given.

APPEAL from Jefferson Circuit Court.

Heard before Hon. A. A. COLEMAN.

This is an action brought by McQueen as Admr. of Edwards to recover damages for the death of Edwards who was an employe of the defendant company. The complaint was in the following language: 1st, Plaintiff claims of the defendant $25,000 as damages for that heretofore, towit, on the 28th day of November, 1903, defendant was operating a furnace for the manufacture of pig iron in Birmingham, Ala., which furnace was known as the Williamson Furnace; that on said day, while plaintiff's intestate was in the service or employment of defendant and engaged in or about the said business of defendant at or near said furnace, the said furnace broke

[Williamson Iron Co. v. McQueen, as Admr.]

or gave way, and a large quantity of molten or semi-molten matter issued from said furnace as a proximate consequence of said breaking or giving way, and so badly burned plaintiff's intestate that he died as a proximate consequence thereof. Plaintiff alleges that said furnace broke or gave way and his intestate's death was caused as aforesaid, by reason and as a proximate consequence of the negligence of a person in the service or employment of defendant, who had superintendence intrusted to him, whilst in the exercise of such superintendence, viz: Daniel R. Monroe, negligently caused or allowed said furnace to break or give way and said matter to issue therefrom as aforesaid, and thereby negligently caused intestate's death as aforesaid.

2nd. Plaintiff refers to and adopts all the words and figures of the first count, to and including the words, "viz." where it first occurs in said count. Plaintiff adds thereto the following words: an employe of defendant who had superintendence of the defendant's crew, at or upon the top of said furnace, and which crew was engaged in or about loading said furnace or putting material therein, for the manufacture of pig iron, but the name of which employe is unknown to plaintiff, negligently caused or allowed said furnace to break or give way, and thereby negligently caused said intestate's death as aforesaid. Demurrers were filed to count 1 because it does not state a substantial cause of action; because said count does not aver with sufficient certainty what part of said furnace broke or gave way; because, the negligence of defendant or its superintendent is not shown with sufficient certainty; because, it does not sufficiently show in what the superintendency of said Monroe consisted, nor whether said Monroe exercised superintendency over the whole furnace or some portion thereof, because the negligence charged is stated as a general conclusion without sufficient facts to support it. Demurrers were interposed to the second count as follows: separately all the demurrers interposed to count 1; and because it is not averred that the said negligent employe was exercising superintendence at the time of the negligent act complained of; because, it is not averred that the negligent act complained of proximately resulted

from any act or omission of the defendant's superintendent while in the exercise of superintendence; because the superintendence mentioned in said count was not such superintendence as would render the defendant liable for the act or omission of the person exercising it. These demurrers were overruled, and the defendant filed the general issue and special pleas as follows: 2. Defendant for answer to the complaint says that the plaintiff's intestate being then and there the chief executive officer or manager of the defendant in active charge, management and control of the furnace and its operation, himself, negligently caused or allowed said furnace to break and give way and said molten or semi-molten matter to issue therefrom and as a proximate consequence thereof, his death was caused. 3. Defendant says that the plaintiff's intestate being the defendant's superintendent having the charge and control of said furnace whilst in the exercise of such superintendence, so negligently operated or superintended the same as to cause said furnace to break and give way and said molten matter or semi-molten matter to issue from the furnace, and as a proximate result thereof, his death was caused. The facts necessary to a proper understanding of the opinion sufficiently appear therein.

The following written charges were given at the request of the plaintiff: "(2) Whether the bosh jacket was old or not, if the jury believe from the evidence that it was reasonably sufficient for a furnace of that size, or that it appeared to Edwards in the exercise of reasonable care and diligence that the bosh jacket was reasonably sufficient, and that Edwards was a reasonably careful and prudent man, then he could not be charged with contributory negligence in reference to the bosh jacket, even if the jury should believe that greater strength in the bosh jacket would have prevented the death of Edwards. * * * (4) If the jury are reasonably satisfied from the evidence that either the first or second count of the complaint is true, then plaintiff's case is made out, and the age or condition of the bosh jacket or the weakness or strength of the furnace could not prevent a recovery by plaintiff, unless the jury should be reasonably satisfied from the evidence that Thomas J. Ed-

wards was himself guilty of negligence which proximately helped to cause his own death.  *  *  *  (9) If the jury are reasonably satisfied from the evidence that any one witness willfully swore falsely in any material particular, then the jury may disregard the testimony of that witness entirely."

It was shown that the witness McCune had been engaged in and about the furnaces, in building, operating, and repairing them, for 35 years. Plaintiff propounded this question to him : "From all you saw there, and from your expert knowledge; from what you saw both before the accident and after the accident, would you not or would you, say that that furnace before the accident was in good condition for operation?" Defendant objected to the question, and his objection was overruled. The witness answered: "From all I could have seen from looking at the furnace before it went into blast, I would have been perfectly satisfied to run the furnace." There was motion to exclude this answer, which was overruled.

The witness McQueen, after testifying to his knowledge of furnaces and his experience in operating them, was asked by plaintiff: "Did you on that day see material there which came from that furnace that was too large to be put into the furnace?" The defendant objected to the question, and the court overruled the objection. Defendant also objected to this question, propounded by plaintiff to witness: "In your judgment, was that of sufficient thickness for a furnace of that size?" The objection was overruled. The witness was also asked the further question, which was objected to by defendant: "Describe to the jury, not giving your opinion about the strength of the iron, but describe the condition of the iron. Had the iron crystallized when it was torn loose?"

There was verdict and judgment for plaintiff and defendant appeals.

JAMES WEATHERLY, for appellant, insisted upon the errors assigned and which are fully treated in the opinion but cited no authorities in his brief.

BOWMAN, HARSH & BEDDOW, for appellee.—The court did not err in overruling the demurrers interposed to counts 1 and 2 of the complaint.—*Armstrong v. Mtgy. St. Ry. Co.*, 123 Ala. 244; *A. G. S. R. R. Co. v. Davis*, 119 Ala. 572; *L. & N. R. R. Co. v. Marbury Lumber Co.*, 125 Ala. 237; *Russell v. Huntsville Co.*, 137 Ala. 368. The court did not err in overruling defendant's objection to the question and answer of plaintiff's witness, Edwards.—*Montgomery v. Gilmer*, 33 Ala. 116; *Mobile Ins. Co. v. Walker*, 58 Ala. 294; *Buckalew v. R. R. Co.*, 112 Ala. 146; *R. R. Co. v. Mothershed*, 97 Ala. 261. Charges 1, 2, 3, 4, 6, 7, and 10 given at the request of the plaintiff announce elementary principles of negligence and contributory negligence.—1 Thompson's on Neg. § 1, p. 2, (last ed.); *Garlick v. Dorsey*, 49 Ala. 220. Charges 5, 8 and 14 state the facts of the undisputed evidence in the particulars set out. Charge 9 is supported by *A. G. S. R. R. Co. v. Frazier*, 93 Ala. 51.

Charges 1, 2, 3, and 15, refused to defendant were properly refused.—*K. C. M. & B. R. R. Co. v. Burton*, 97 Ala. 240; Reno Employer's liability Act, § 67, Labatt M. & S. Note 1, p. 1997; Dresser Employer's Liability, § 59, p. 273. Charge 22 was particularly bad.—*L. & N. R. R. Co. v. Allens*, 78 Ala. 501. There are three defects in charge 23.—*Thompson v. L. & N. R. R. Co.* 91 Ala. 498; *L. & N. v. Jones*, 83 Ala. 376.

DENSON, J.—Action to recover damages for negligently causing the death of plaintiff's intestate. The complaint contained three counts, the third of which has been left out of view by the affirmative charge of the court for the defendant with respect to that count. The first and second counts were based upon subdivision 2 of the employer's liability act (Code 1896, § 1749.) A demurrer to each of these counts was overruled by the court. After careful consideration of them we are constrained to hold, in line with the rule established by numerous decisions of this court, that the counts were not subject to the demurrers interposed, and the court committed no error in overruling them.—*Bessemer Land Co. v. Campbell*, 121 Ala. 50, 25 South. 793, 77 Am. St. Rep. 17; *Bear Creek Mill Co. v. Parker*, 134 Ala. 293, 32 South.

700; *A. G. S. Ry. Co. v. Davis,* 119 Ala. 573, 24 South. 862; *L. & N. R. R. Co. v. Jones,* 130 Ala. 457, 30 South. 586; *L. & N. R. R. Co. v. Marbury Lumber Co.,* 125 Ala. 237, 28 South. 438, 50 L. R. A. 620; *Armstrong v. Montgomery St. Ry. Co.,* 123 Ala. 244, 26 South. 349. The case was tried on the plea of the general issue and on two special pleas setting up contributory negligence on the part of the plaintiff's intestate. The trial resulted in a verdict and judgment for the plaintiff in the sum of $6,500, and the defendant appealed.

The deceased, Thomas J. Edwards, was a stockholder in the defendant company, and a member of its board of directors. He was also defendant's general manager in active control and management of its furnace. As such manager he employed all the servants worked by the defendant at its furnace, and had general superintendence over them. His death is alleged in the first and second counts to have occurred while he was in the service or employment of the defendant at or near the defendant's furnace. The cause of his death is alleged in this language: "The said furnace broke or gave way and a large quantity of molten or semi-molten matter issued from said furnace as a proximate consequence of said breaking or giving way, and so badly burned plaintiff's intestate that he died as a proximate consequence thereof." The first count alleges that Daniel R. Monroe was in the service or employment of the defendant with superintendence intrusted to him, and the breaking or giving way of the furnace is ascribed to the negligence of Monroe while in exercise of such superintendence. The second count is the same in its averments as the first, with the exception that the name of the employe to whom negligence is ascribed is alleged as being unknown to the plaintiff, and he is alleged to have had superintendence of the defendant's crew at or upon the top of said furnace. It is also alleged in the second count that the crew at the top was engaged in or about loading said furnace or putting material in it for the manufacture of pig iron. The evidence was without conflict that during the day the deceased had general superintendence over all the servants at the furnace; that at night he would go home leaving Monroe in gener-

al control and superintendence in his stead; that deceased would never return to the furnace during the night after leaving it in the evening unless sent for on account of some accident to the furnace. During the night preceding the day on which his death occurred he was not at the furnace, nor was he sent for to go there. On the morning of the day he was killed he and his brother on arriving at the furnace discovered that there was something wrong with the furnace, it was choked, and they set about to discover what caused the choking, and while examining around the furnace there was a slip in the furnace which precipitated the load or burden with such force as to cause the molten iron to break through the "bosh jacket" of the furnace and overwhelm the deceased.

The plaintiff's contention on the trial was that a scaffold was formed in the furnace by feeding the furnace with too large sized material, or otherwise improperly loading the furnace, and that the scaffold fell against the "bosh jacket" with such tremendous force as to cause it to give way or break. It was contended that improper loading was negligently allowed by those having superintendence of the preparation of and loading the material that was put in the furnace during the night preceding the day on which the accident occurred.

It was shown without conflict in the evidence that, when the plaintiff's intestate left the furnace at night preceding the day on which he was killed, he left Daniel R. Monroe in general superintendence of the furnace. Monroe's duty was to look after everything that pertained to the running of the furnace at night the same as the deceased did during the day. The material that was put in the furnace was loaded from what was termed in the evidence a "stockhouse," into vehicles called "buggies," and the buggies were elevated to the top of the furnace, and there the material in the buggies was loaded into the furnace. Two men were stationed on the platform at the top of the furnace whose duty it was to load the material from the buggies as they were sent up, into the furnace. The evidence details the preparation that was made of the stock for loading it on the buggies. In the language of the witness Monroe: "The stock is

[Williamson Iron Co. v. McQueen, as Admr.]

dumped in all furnace stockhouses in great chunks, and we beat it up, down below before we put it in." The evidence showed that men were engaged in breaking the ore, or stock, with hammers preparatory to loading it on the buggies to be carried to the top of the furnace, and the breaking was done as they needed the ore for loading the buggies. To see that the ore was broken in proper size for loading into the furnace, and that ore of too large size was not loaded on the buggies, the evidence showed that it was necessary to keep a man there all the time, whose duty it was to overlook and watch the employes as they broke the ore and loaded it on the buggies; it was also his duty to weigh the ore in the buggies. It was shown that Pat Crawford was intrusted with the special superintendence of the employes who were breaking and loading the ore the night preceding the day on which the accident occurred. There was also evidence which tended to show that Crawford had the special superintendence of the two men at the top of the furnace who unloaded the contents of the buggies into the furnace; and that, when a buggy loaded with material was sent to the top, it was the same as an order from Crawford to the men up there to put the load into the furnace. The evidence further tended to show that, while Crawford was intrusted with the special superintendence of the crews that were breaking the material and loading the buggies and the furnace, Monroe had the general superintendence at night of all the employes. In other words, Crawford, as the evidence tended to show, was subject to the orders of Monroe, but it was his special duty to watch over and superintend the servants who were breaking the material and loading it, and they, in this respect, were subject to his order. Witness Monroe testified that when the deceased went home at night he ceased to exercise control over Crawford and the men who handled the "stuff," but it was left entirely to Crawford and to him; that he and Crawford were the only ones in charge at night. There was also evidence tending to show that there was an employe who worked during the day, and who was charged with the same special duties that were rested upon Crawford during the night.

181

We think there can be no doubt that Monroe and Crawford in their respective spheres of duty were in the exercise of superintendence. Further, that, if the accident was caused by the negligence of either or both of them while in the exercise of their superintendence, the liability of the defendant would be fixed, unless negligence on the part of the deceased proximately contributed to the accident.—*Dantzler v. De Bardelaben Coal Co.*, 101 Ala. 309, 14 South. 10, 22 L. R. A. 361. As was said in the case of *K. C. M. & B. R. Co. v. Burton*, 97 Ala. 240, 12 South. 88: "Under subdivision 2 of the statute, the liability of the defendant is in no sense dependent upon the relations existing in the service between the negligent and the injured person. If the former has superintendence intrusted to him, and is negligent in the exercise of it to the injury of any 'servant or employe in the service or business of the master,' whatever be the relation inter se of the servants, the master is made liable therefor by the terms of the statute."—Labatt on Master & Servant, note 1, p. 1997; Reno's Employer's Liability Act, § 67.

There was evidence tending to show that the material, or some of it, that was put into the furnace during the night preceding the day of the accident was of too large size. There was also evidence tending to show that there was negligence in this respect on the part of Crawford and Monroe. The evidence further tended to show that the scaffold which formed in the interior of the furnace, and which fell or slipped and caused the death of plaintiff's intestate, was the result of loading the furnace with material of too large size. But it is insisted by the appellant that Crawford would not be guilty of negligence in allowing improper material to be put in the furnace, unless he knew, or in the exercise of due care ought to have known, that the loading of improper material into the furnace would cause the "bosh jacket" to break or give way. In other words, to state appellant's contention in this respect in the language of its counsel: "Crawford must be chargeable with knowledge of the probable consequences of his act or omission before legal responsibility can be fixed on the defendant on that account." The argument of counsel is that the evidence showed

that the improper loading of the furnace and the formation of the scaffold would not ordinarily or proably have such a result as the breaking of the "bosh jacket," unless there had been extreme weakness in the furnace. That the only immediate effect of such improper loading would be the formation of the scaffold on the interior of the furnace, which it is argued is a very common experience, and one not usually resulting in such a catastrophe in properly constructed furnaces. Further, that Crawford, "a mere day laborer," could not be held to have anticipated the result which followed. In this respect the evidence tended to show that Crawford knew that loading the furnace with material of too large size was liable to form a scaffold of the kind that was formed in the furnace in question, and that scaffolds when formed would fall. Furthermore, in his cross-examination, we find he testified as follows: "This was a small furnace and required the material fed to it to be smaller than is used in a larger furnace, and according to my orders that is what they done. My orders were to break the material small enough so it would not hurt the furnace—to break it up to a certain proper size on account of it being a small furnace. Mr. Edwards gave me those instructions. Mr. Edwards told me to put no large stuff in the furnace for fear it would injure the furnace." From this evidence it appears that Crawford knew that it was wrong to load the furnace with material that was not of the proper size, and that material of too large size when loaded into the furnace was liable to do damage. It may be that he did not anticipate that the scaffold in falling would break the "bosh jacket," nor that the molten iron would flow through the break and kill the intestate. It may be that the accident, in the precise form and with the precise attending circumstances which resulted in Edward's death, could not have been expected to have happened from the putting of improper material into the furnace. The reason or imagination is unable to determine just the effect of such improper loading of a furnace. The result may be unusual, unexpected, indeed, a surprise to the most experienced—never before heard of by any one—yet the act of allowing the improper material to be loaded into the furnace

would be none the less negligent, for it was liable to produce many results which would cause injury. The evidence of Monroe, one of the defendant's witnesses, showed that he had witnessed the breaking of three furnaces by the falling of scaffolds. So it may be said that the falling of a scaffold in a furnace would properly cause a break in the furnace sufficiently large for molten matter to flow through. Because the negligence may have produced an effect never before observed, it cannot therefore be said that the servant in allowing the furnace to be loaded with unproper material was in the exercise of due care.—*Doyle v. C., St. P. & K. C. R. Co.*, (Iowa) 42 N. W. 555, 4 L. R. A. 420; *Armstrong v. Montgomery St. Ry.*, 123 Ala. 233, 26 South. 349. "Mere negligence which gives a cause of action is the doing of an act, or the omission to act, which results in damage, but without intent to do wrong or cause damage."—*B. R. & E. Co. v. Bowers*, 110 Ala. 238, 20 South. 345. Here, then, the rule would seem to be that, allowing improper material to be loaded into the furnace being negligence, if the death of the intestate resulted as a proximate consequence of that negligence, the defendant would be liable, unless the intestate himself was guilty of negligence which proximately contributed to his hurt.—*Peters v. So. Ry. Co.*, 135 Ala. 533, 33 South. 332; *Armstrong v. Montgomery St. Ry., supra*.

The insistence of the defendant presents the question of contributory negligence in three phases: (1) The evidence showed without conflict that when the intestate and his associates acquired the furnace property it had been out of blast for some time, and was not then in condition to be operated. It had to be renovated—put in condition to successfully make iron. In making the repairs on the furnace the evidence further showed, without conflict, that the intestate had general superintendence of the repairs and the servants who were engaged in making them. The insistence of the defendant is that in making the repairs on the furnace the intestate negligently allowed an inferior and unsuitable "bosh jacket" to be placed in the furnace. The evidence without conflict showed that the intestate was a competent and exceedingly careful man. If there was evidence tending

to show negligence on the part of the intestate, there was also evidence tending to show due care and prudence, and the most that can be said for the defense in respect of this insistence is that the evidence was in conflict. This made the question one for determination by the jury. (2) It is insisted that the intestate was guilty of contributory negligence in allowing the use of inferior coke in the furnace. The defendant had on hand, and was using at the time among other qualities of coke, a quality known as Gilreath coke. It may be said in respect of this question the evidence did show that the defendant had on hand some Gilreath coke, but it was also shown that it was an inferior coke relatively speaking, as one witness expressed it, it was inferior comparatively speaking. The defendant's witness Bird testified that he received and weighed the coke that was purchased and used by the furnace. That in November, 1902, the furnace received 112 cars of coke, something like 3,000 tons, and 21 of those cars were received from the Gilreath Company, making 814 tons. He testified that the proportion of coke received from Gilreath to the other coke was 815 as 3,000 tons. He further testified that as much as possible the coke was kept separate. He testified that he knew good coke from bad coke; that the Gilreath coke was a fair sample of coke; that all coke contained impurities; that the Gilreath coke was not as good as the other coke the furnace used. On cross-examination the witness Bird, testified that, when he stated that the Gilreath coke was a fair sample of coke, he meant that it was good coke, only the other was better. "It is fair average coke, just like Blocton coal is good, only the Montevallo is better." It may be said, in reference to this question, that the coke was not purchased by the intestate, but the evidence without conflict shows that it was purchased by the president of the company and Mr. Bradley. The president testified that he and Mr. Bradley bought practically all the coke that was used at the furnace; that Mr. Edwards had to take what they sent him; that they bought the Gilreath coke and sent it out for Mr. Edwards to use in the furnace making iron. The evidence also showed that when inferior coke was used in a furnace it was all right

if a double portion of it was put in the furnace, and we remark that not only does the evidence not show that Gilreath coke was being used during the night preceding the day on which the accident occurred, but the evidence shows that the material to be used was properly portioned by Edwards, before he left the furnace on the evening of the night that preceded his death. The testimony tended to show that the material was loaded in the proportion fixed by Edwards. It is true that the testimony showed that they did sometimes use Gilreath coke, but, we repeat, the evidence fails to show that Gilreath coke was being used on the occasion in question. Moreover, Crawford testified with respect to the bad coke as follows: "If there was some bad coke in there, the unit of scale was so fixed that it should be overcome by an extra amount of coke, and that is the rule I had to work by. The man in charge at night could use too much bad coke if he wanted to, or use too little good coke. It is manifest from the evidence that the use of inferior coke was not *per se* negligence; but, if negligence, it was only so when used in improper portions. Considering this insistence in all its bearings, we think it was a question that was properly left to the jury. (3) It is insisted that the intestate was guilty of contributory negligence in making the cast, causing the blast to be withdrawn just prior to the time when the slip occurred in the furnace. R. K. Edwards, who was an expert, testified that he was with his brother, the intestate, when the cast was made, and that the cast had nothing to do with the scaffold falling; that it did not superinduce it. So there was no reason in respect of this insistence for making the question of contributory negligence one of law for the court to declare. We have gone thus into the discussion of the insistences of the defendant, both with respect to the general affirmative charge with hypothesis requested by the defendant and the refusal by the court of the motion for a new trial, on the ground that the verdict was contrary to the evidence.

We do not think the case on the evidence was one which should have been settled by the court as a matter of law, and hold that the affirmative charge requested by the defendant was properly refused.—*State v. Houston,*

[Williamson Iron Co. v. McQueen, as Admr.]

83 Ala. 361, 3 South. 859. On the motion for a new trial, we cannot say that there was a palpable failure of evidence to support the finding of the jury, and cannot therefore hold that the circuit court erred in overruling, the motion.—*Cobb v. Malone,* 92 Ala. 630, 9 South. 738; *Jones v. Tucker,* 132 Ala. 305, 31 South. 21. The special charges requested by the defendant were asked in bulk, and, having determined that one of the series was bad, to wit, the general affirmative charge, there was no error in refusing the whole series.—*Yeats v. State,* (Ala.) ·38 South. 760; *Rarden v. Cunningham,* 136 Ala. 263, 34 South. 26; *Verbery's Case,* 137 Ala. 73, 34 South. 848, 97 Am. St. Rep. 17; *Bell's Case,* 139 Ala. 124, 35 South. 1021. As to the charges given at the request of the plaintiff, error is insisted on only with respect to those numbered 2, 4, and 9, respectively. Construed with reference to the evidence, we think each of those charges asserted a correct proposition of law. Charge numbered 9 finds support in the case of *A. G. S. R. Co. v. Frazier,* 93 Ala. 45, 9 South. 303, 30 Am. St. Rep. 28.

This brings us to the consideration of the court's rulings on the admissibility of evidence. The question of the defendant to its witness Monroe, "Don't you know with the utmost care they slip in?" was clearly a leading one, and the court committed no error in sustaining the objection to it. In connection with his evidence as to his opportunities for observing the furnace and his actual observation of it, we think the court properly overruled the objection made by the defendant to the question asked by plaintiff of the witness McCune. We are of the opinion that the evidence showed that the witness McQueen was an expert with reference to the matters he was examined about, and to which defendant objected, and the court committed no error in overruling the objections made by the defendant to the questions propounded to him by the plaintiff.

We have given consideration to all of the errors insisted upon in the brief of counsel, and having found no error in the record the judgment of the circuit court will be affirmed.

Affirmed.

TYSON, DOWDELL, and ANDERSON, JJ., concur.