44 So.2d 266

## ANDERSON v. STATE.

### 6 Div. 898.

Court of Appeals of Alabama.
Jan. 31, 1950.

David Satterwhite, of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

**HARWOOD, Judge.**

This appellant was indicted for murder in the first degree, the charge growing out of the death of his wife. His jury trial resulted in a verdict of guilty of manslaughter in the first degree. Judgment and sentence were entered in accordance with the verdict.

The deceased, Mrs. Willie Belle Anderson, died in the Jefferson-Hillman Hospital on Sunday, August 22, 1948, at about 7:20 P.M., as a result of a massive subdural hemorrhage, which in the opinion of medical testimony introduced by the State resulted from a trauma, that is a blow, or blows, to the head. Mrs. Anderson had been admitted to the hospital in a comatose condition the day previous to her death.

Mrs. W. M. Lacey, a witness for the State, testified that she lived in an apartment adjoining that of the Andersons, a part of the wall separating the two apartments being a swinging door which had been nailed up.

On Friday, August 20, 1948, between 3 and 5 o'clock in the afternoon, she heard from the Anderson's apartment a man's voice saying "I have told you and told you not to do it," and after that the sound of blows, with a woman's voice "begging some one not to hit her anymore, that he would kill her." The blows sounded like someone hitting a punching bag. After the blows she heard a thud.

After the blows had stopped she heard a man's voice tell someone to "Get your God damn clothes and get the hell out of here." After this command she heard the same male voice in a pleading tone asking someone to get up, following which she could only hear some mumbling.

She telephoned Mrs. Rose Sparrow Moore, who lived in the same apartment building to come up, and Mrs. Moore arrived in Mrs. Lacey's apartment shortly thereafter.

Mrs. Moore testified that when she got to Mrs. Lacey's apartment she went to the kitchen. There she heard a man's voice in the Anderson apartment: "he was calling her a God damn son of a bitch, and telling her to get up and get out. * * * and then for a certain period of time, a few minutes—there seemed to be fear in his voice. He said 'please, get up,' in a different tone, as if begging her to get up— and frightened."

After that she heard nothing more from the Anderson apartment.

Mrs. D. L. Pitner another resident in the apartment building testified that the first landing of the steps to her apartment was beneath the bathroom window of the Anderson apartment. About noon on August 20, 1948, she was on this landing, and heard voices arguing in the Anderson apartment, and the sound of slaps. She heard a woman's voice asking "Jack, why do you treat me this way; I love you so much."

Between 4 and 5 o'clock that same afternoon she returned to the landing. This time she heard fighting in the Anderson apartment. "He was calling her a no good son of a bitch, and everything, and just cursing her."

This time Mrs. Pitner "heard licks pass," and she heard "one very bad lick and something like a person falling," and a woman's voice say: "for God's sake Jack, don't hit me anymore."

Coley Wright, janitor for the apartment building, a witness for the State, testified that following a report made to him by Mrs. Moore he went to the Anderson apartment. The appellant answered his knock on the door. Appellant was unclothed at

this time. Wright was admitted to the apartment by the appellant. He observed Mrs. Anderson lying unconscious on the bathroom floor, with her head near a radiator. Blood was coming from her nose and mouth.

The appellant told Wright that Mrs. Anderson was drunk and had fallen off the commode, and that it was not necessary to call a doctor.

Wright and appellant picked Mrs. Anderson up. She said nothing the whole time he was in the apartment.

The next morning appellant came down and got Wright who drove him out to get a nurse.

When they returned to the apartment he saw Mrs. Anderson again, and she was still unconscious. He observed a bruise on Mrs. Anderson's forehead.

Alice Williams, a witness for the State, testified that she lived with Coley Wright back of the apartment building.

About 2 o'clock on the afternoon of Friday, August 20, 1948, the appellant came to her and said that his wife was drunk and had urinated on herself and he wanted her to give his wife a bath.

The witness went to the Anderson apartment. Mrs. Anderson was lying on the bathroom floor, and she did not observe that she was bleeding, though there was evidence she had urinated on herself.

She gave Mrs. Anderson a bath, and put her to bed. Very shortly Mrs. Anderson got out of bed. The appellant told her to lay back down, and she called him a son of a bitch. The appellant thereupon struck her a blow "up here" with his fist and knocked her down. Mrs. Anderson again called appellant a son of a bitch and he slapped her.

Mrs. Anderson then told him "Jack Anderson, you are going to pay for this sooner or later."

Mrs. Anderson then came to the witness and asked her not to let appellant hit her any more, and witness replied she wouldn't. The witness then immediately left the Anderson apartment.

She returned in the afternoon around 4 o'clock, and remained until she had prepared supper. Mrs. Anderson was drunk at this time, and the witness fed her her supper.

The next morning, Saturday, August 21, 1948, the appellant came to this witness and requested that she come and try to clean Mrs. Anderson up until he could get a nurse.

When this witness came to the Anderson apartment on Saturday morning Mrs. Anderson was apparently unconscious.

The appellant told the witness to wash some bloodstained towels. There were some five or six of these towels. Some were soaked with blood. The appellant told the witness "Alice, there is some clorox and bleaching that Belle used, and put some on there so nobody won't see the stain."

When the nurse arrived the witness assisted in cleaning some blood from around Mrs. Anderson's mouth.

The appellant was drinking Saturday morning.

Mrs. Mabel Jones, a practical nurse, testified that she arrived at the Anderson apartment around 7 o'clock on Saturday morning, August 21, 1948, in response to a call. Mrs. Anderson was unconscious upon her arrival, and remained unconscious throughout the day. Mrs. Anderson had a knot on her head. Mr. Anderson spent the day in bed.

Mrs. S. A. Caudle, another practical nurse also tended Mrs. Anderson on Saturday. The appellant came for her in an automobile between six and seven o'clock that morning.

Upon arrival at the Anderson apartment she found Mrs. Anderson unconscious, with dried blood around her mouth and nose, and a knot on her head.

Mrs. Caudle suggested to appellant some half dozen times during the day that his wife be removed to a hospital. Appellant replied that there was nothing wrong with his wife but drunkenness, and he had told or promised his wife that he would not take her to a hospital.

On cross examination Mrs. Caudle testified that after receiving the call from

the nurse's registry she called the Anderson place. Some woman answered the phone and stated that she was a nurse, and did not need a nurse, and then broke the connection. Mrs. Caudle called a second time. Mr. Anderson answered this time, and made arrangements for picking her up. Later the appellant and a driver did come and get her.

Mrs. Gladys Jenkins, a practical nurse, testified that she spent the Wednesday night prior to Mrs. Anderson's death in the Anderson apartment. Mrs. Anderson, who was also a practical nurse, had an alcoholic patient in the apartment whom she was nursing. Mrs. Anderson was sober during her stay with her. Friday morning Mrs. Jenkins talked with Mrs. Anderson over a phone, and she sounded normal and sober. She called again Friday night but got no answer.

Mrs. Anderson was taken to the Jefferson-Hillman Hospital by Mrs. Caudle and Mrs. Jones around 7 P.M. on Saturday. She expired the following day, August 22, 1948 around 7 P.M., having never regained consciousness.

J. O. Norrell, a detective for the City of Birmingham, testified that he went to the hospital on August 22, 1948, and found Mrs. Anderson dead. She had a bruise on her forehead. He thereupon went to appellant's apartment. Appellant had been drinking, but gave him permission for an autopsy.

Mr. Norrell observed a spot of blood and saliva on the bathroom floor when he examined the Anderson apartment.

Later when he interviewed appellant the appellant stated he had been in Decatur on Friday, August 20, 1948, and had returned to his apartment around 7:30 or 8:00 o'clock that night. He walked into the kitchen, and not finding his wife he came back to the bathroom and found her lying on the bathroom floor unconscious.

Mr. Norrell testified on cross examination that if the appellant came to him later and stated he was mistaken as to the date he had said he was in Decatur, he, Norrell, did not remember such incident.

Mrs. Helen Seabury testified that she met the appellant during the last week of August, 1948. During the first week of September, 1948, he took her to Georgia where they went through some sort of marriage ceremony. Upon their return to Birmingham the appellant moved into her apartment. During this time they visited her brother in Decatur, and her father visited them. Appellant was introduced to these relatives as her husband.

Mrs. Seabury testified that in November, 1948, appellant on one occasion told her: "I have killed one woman, and I will kill you."

It is clearly inferable from the cross examination of this witness that appellant made some effort to break off their relationship. On one occasion appellant was in Selma, and this witness followed him there and demanded money from him.

Fred Garner, son of the deceased by a former marriage, testified that he saw his mother, in her apartment, on Saturday, August 21, 1948. She was unconscious at this time, with a bruise on her forehead. He was in the apartment until his mother was removed to the hospital around 7:00 o'clock P.M.

Garner further testified that the appelland told him during this visit that he, appellant, had returned to Birmingham from out of town around 7:00 P.M. on Friday, August 20, 1948, and had found his mother, the deceased, unconscious on the floor in a back room.

Medical testimony presented by the State through doctors connected with the Jefferson-Hillman Hospital tended to show that Mrs. Anderson was unconscious upon her admission to the hospital, and remained in such condition until her death.

She had bruises above the right eye, left eye, forearm and knees.

The direct cause of her death was a massive subdural hemorrhage.

This condition could have resulted from a fall from a commode, or from being knocked down and the head striking a floor. The trauma causing the injury could have been caused in many ways.

For the defense Mr. Wallis R. Hartsfield testified that he visited the Anderson apartment about 6:30 P.M. on Friday, August 20, 1948. Mrs. Anderson was conscious and talking during his visit, but intoxicated. The maid fed her her supper.

He further testified that during his visit, and about 7:00 P.M., a taxi driver came to the door and presented a check to be endorsed by Mrs. Anderson, which she did.

This check was introduced in evidence by the defense. This check, drawn on Exchange Bank, Birmingham, Alabama, bears the date 8-17-48, is signed by Charles L. Lewis and payable to Mrs. Willie Belle Anderson.

It is to be noted that said check, by perforations, bears the legend "Paid-8-20-48-61-542."

R. J. Gautney, a taxi driver, testified that he went to the Anderson apartment either on Thursday or Friday night, August 19th or 20th, to get Mrs. Anderson to endorse a check. Mr. Hartsfield was in the apartment the night he was there. Mrs. Anderson endorsed the check for him, and she appeared "pretty much under the weather, and she was very nervous," apparently from drink.

Evan Mims testified that he was in the Anderson apartment on the Tuesday night prior to her death. Bill Martin was there as an alcoholic patient, and was drunk, as was Mrs. Anderson. He saw Mrs. Anderson fall as she tried to get into a bed, and appellant had to help her into the bed.

Mr. Norrell on recall examination testified that a radiator in the bathroom of the Anderson apartment is about 5 feet from the commode, and that Mrs. Anderson was about 5 feet 6 inches in height.

Several witnesses testified that appellant's general reputation was good, as was his reputation for peace and quietude.

In his own behalf the appellant testified that all during the week in which she was injured his wife was drinking, and had several falls. On Friday, August 20, 1948 his wife was sober in the morning. When he returned from his office about 2:00 P. M.

he found her lying on the floor between the bedroom and bathroom. She was drunk and had urinated on herself. He got the witness Alice Williams to come up and bathe her. After the bath he helped dress her. She was drunk and incoherent.

She took two phenobarbital tablets during the afternoon, and several more drinks.

While the maid, Alice Williams, was present his wife called him a son of a bitch twice, and he slapped her each time on the right side of her face. Appellant denied that he struck his wife other than these two slaps.

Later his wife quieted down and he left the apartment to make some business calls. When he returned between 5:00 P. M. and 6:00 P. M. his wife was drunk again. He then called Mr. Hartsfield and asked him to come to his apartment.

Mr. Hartsfield came to his apartment, and during Hartsfield's visit the taxi driver Gautney came about the check.

After Hartsfield left he went down to put his car in a garage. Upon his return Mrs. Anderson was sitting on the commode in the bathroom. He went into another room to prepare for bed, and while engaged in this he heard a sound as if someone had fallen. He went to the bathroom and found Mrs. Anderson lying on the floor with her head near a radiator.

He asked her what was wrong, but she only groaned. He reached to pick her up when the door bell rang. Coley Wright, the janitor, was at the door. He had Wright help him move Mrs. Anderson to a day bed. A little blood was coming from her nose.

The next morning his wife was up and about. She took a phenobarbital tablet, and searched for whiskey, but found none. She then requested that he call a nurse for her, which he did.

Shortly after he had called the phone rang and his wife answered and stated she did not need a nurse. The phone rang again and he answered, and made arrangements to pick up Mrs. Caudle, the nurse.

After Mrs. Caudle got to the apartment he "proceeded to get drunk."

Appellant claimed he did not remember Mrs. Caudle suggesting that his wife be taken to a hospital, but thought Mrs. Caudle had told him that she had seen his wife that way before, and that she would be all right.

He recalled that later in the day Mrs. Caudle did suggest that Mrs. Anderson be taken to a hospital, but he had promised his wife he would not put her in a hospital when she was drunk.

Appellant further testified that he met Helen Seabury after his wife's death, and had taken several trips with her, but none to Georgia, and eventually began spending his weekends in her apartment.

He testified further that he had twice been questioned by police officials after his wife's death, and was told to go.

While on a vacation in Georgia he learned he was wanted for further questioning, and immediately made efforts to contact Birmingham officers to tell them that he would be back.

Upon introduction of the check which Gautney, the taxi driver brought to the Anderson apartment, it was developed upon cross examination of the appellant that the check in the amount of $7.00 bore a perforated cancellation legend showing "Paid-8-20-48."

Defense counsel thereupon stated he wanted an "instanta subpoena for the cashier of the Exchange Bank," to which request the court added "And let him bring the documents as to when this check was cashed."

Upon completion of appellant's testimony the bailiff made known that "The man from the bank is here." After conferring with this witness the defense counsel announced that "the cashier here didn't make the entries; I cannot use him."

The court then, over objection of defense counsel, stated that the court had ordered the witness subpoenaed, and wanted him examined.

Thereafter, through this witness, a cashier in the Exchange Bank, and over objection of appellant, there was received in evidence a ledger sheet showing Charles L. Lewis' account in the Exchange Bank during the month of August 1948, which record shows the payment of a check for $7.00 on August 20, 1948.

The appellant's grounds of objection to the introduction of the ledger sheet were that the witness from the bank did not personally make the record, and that he was not offered by appellant and was being permitted to testify over the appellant's objection.

The fact that the witness, a cashier of the bank, did not personally make the record is no ground for excluding the evidence offered. He did testify that so far as he knew the entries were true and correct. Though a valid objection may possibly have been interposed, the ground stated being insufficient, and the evidence being relevant to the issues, the lower court will not be put in error because of its ruling under such circumstances. Sawyer's Adm'r v. Patterson, 11 Ala. 523; Richards v. Bestor, 90 Ala. 352, 8 So. 30; Baugh v. North Alabama Coal & Mineral Co., 220 Ala. 242, 124 So. 528.

The other ground assigned to the objection, i. e. that the witness was not offered by the appellant, is without merit. The court desired the witness to be examined.

It is within the sound discretion of a trial judge, in the interest of truth and justice, to call to the stand and examine, or permit to be examined by both parties, any witness who may be able to shed light upon the issues, the court being careful to preserve an attitude of impartiality. Hunt v. State, 248 Ala. 217, 27 So.2d 186; Gomila v. U. S., 5 Cir., 146 F.2d 372; Roth v. Moeller, 185 Cal. 415, 197 P. 62; State v. Horne, 171 N.C. 787, 88 S.E. 433; Pendleton v. Commonwealth, 131 Va. 676, 109 S.E. 201; Townsend v. City of Joplin, 139 Mo.App. 394, 123 S.W. 474; Merchants' Bank v. Goodfellow, 44 Utah 349, 140 P. 759.

Actually, the only evidentiary matter disclosed by the ledger sheet was to the effect that some undescribed check for $7.00 had been paid on the account of

Charles L. Lewis on August 20, 1948. Since a check itself executed by said Lewis in the amount of $7.00, payable to Willie Belle Anderson, had been offered in evidence by the appellant, and since the check itself bore a perforated legend showing it was paid on August 20, 1948, it does not appear that appellant's substantial rights were probably injured by the introduction of the ledger sheet.

■ The hospital record of the Jefferson-Hillman Hospital, pertaining to deceased was introduced into evidence by the State during the examination of Dr. Frederick Thigpen, an intern in said hospital at the time of deceased's admission into the hospital. Dr. Thigpen testified that such records were made on every patient admitted to the hospital, and are notations made in "the description of business in the handling of that particular patient from her admission."

Later when the record was offered in evidence objection was interposed on the ground that "a lot of other things are in there beside the doctor's own testimony."

This ground is too general to apprise the court of specific objectionable material that may have been in such record. The notes of other physicians attending the deceased, and of nurses, would clearly be admissible, even though additional to Dr. Thigpen's notations in the record, that is in so far as they related to acts, transactions, occurrences, or events incident to the hospital treatment of the deceased. See 144 A.L.R. p. 731; McElroy, The Law of Evidence in Alabama, Sec. 254.

■ Information appearing in such records which is furnished by outsiders is inadmissible. See McElroy, supra.

In that part of the hospital record made by Dr. Crampton Harris there appears a note that: "Dr. Thigpen says he was told by nurse that brought patient in, that she thinks cook may have heard husband beating her, following which patient has been comatose." Dr. Day's notes state: "It is stated patient is a known alcoholic and may have been beaten by husband."

■ The above notes obviously do not pertain to the treatment of the deceased, and were inadmissible. However in view of the lack of specifications in the ground supporting the objection to the admission of the report, and its omission to apprise the court of this defect in the record we are unwilling to cast error on the lower court in this instance.

■ Further, the cook did appear as a witness and testified to the effect that she did see the appellant hit and slap the deceased, deceased being knocked down by the blow. There was other evidence presented by the State from which the jury could reasonably infer that appellant had beaten his wife shortly prior to her admission to the hospital. In light of this positive evidence it would invite considerable speculation to conclude that appellant's substantial rights had probably been injuriously affected by the above mentioned notations in the reports of the physicians, equivocal in nature, contained in the hospital record.

After study of this record it is our conclusion that the remaining rulings of the court on rejection or reception of evidence were patently correct, and do not invite discussion.

■ Written charge 5 was properly refused, not being hypothesized on the evidence.

■ Charges 9, 14, 15, A, and D were refused without error, as these charges were substantially covered in other charges given at the request of the appellant, or by the oral charge of the court.

■ Charges 12, 13, X, and Y were properly refused, as they were invasive of the province of the jury. Chappell v. State, 19 Ala.App. 648, 100 So. 75; Brasher v. State, 21 Ala.App. 255, 107 So. 230; Johnson v. State, 102 Ala. 1, 16 So. 99.

■ Charge 8 was properly refused as misleading, in that it ignores the lesser degrees of homicide included in the indictment for murder in the first degree.

Affirmed.