122 So.2d 360

Drewey AARON

v.

STATE of Alabama.

3 Div. 887.

Supreme Court of Alabama.

July 14, 1960.

Solomon S. Seay, Jr., Montgomery, and J. L. Chestnut, Jr., Selma, for appellant.

MacDonald Gallion, Atty. Gen., Geo. D. Mentz, Asst. Atty. Gen., and Wm. F. Thetford, Circuit Solicitor, Montgomery, for the State.

LAWSON, Justice.

The appeal is from a judgment of conviction for rape with infliction of the death penalty.

The victim, a white woman, was ravished by a Negro man on June 27, 1959.

The appellant, Drewey Aaron, Jr., a Negro, was indicted by a grand jury of Montgomery County on July 17, 1959.

On July 20, 1959, before arraignment and the setting of the case for trial, Aaron moved that the arraignment be continued for one week. The motion for continuance was overruled.

On the same day Aaron filed a motion to quash the indictment, which contained four grounds. Grounds One, Two and Three were stricken on motion of the State. The State joined issue as to the fourth ground, which was overruled after a hearing.

Aaron was arraigned on July 20, 1959. He was represented at arraignment by counsel of his own choice. He pleaded not guilty and not guilty by reason of insanity.

On July 29, 1959, the day set for the trial of the cause, Aaron moved for the appointment of a lunacy commission and for a continuance. After a hearing these motions were denied.

The cause came on for trial before a jury on July 29, 1959. The jury found Aaron guilty and imposed the death sentence on July 30, 1959. Judgment and sentence were in accord with the verdict. Aaron's motion for new trial was denied.

The appeal here is under the automatic appeal statute. Act 249, approved June 24, 1943, General Acts 1943, p. 217. See 1955 Cum. Pocket Part, Vol. 4, Code 1940, Title 15, § 382(1) et seq.

After determining that Aaron is an indigent person, without sufficient funds to pay for the services of an attorney to represent him on appeal, the trial court appointed counsel who represented Aaron in the trial court to prosecute this appeal and to appear here in his behalf.

■ We will first observe that no reversible error is shown by the refusal of the trial court to postpone arraignment. There is nothing in this record to indicate that the defendant was injured by such refusal. At arraignment counsel for defendant interposed pleas to the indictment after defendant's motion to quash the indictment was disposed of adversely to him. The matter of continuance in a criminal case is addressed to the trial court's sound discretion, the exercise of which will not be disturbed unless clearly abused. Logan v. State, 251 Ala. 441, 37 So.2d 753. See Avery v. State, 237 Ala. 616, 188 So. 391, certiorari granted 308 U.S. 540, 60 S.Ct. 119, 84 L.Ed. 455, affirmed 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377.

■ The record does not include a motion to strike the motion to quash. No doubt the motion to strike was oral. It should have been in writing. § 214, Title 7, Code 1940; Southern Ry. Co. v. Penny, 22 Ala.App. 199, 114 So. 15. Cf. Weller & Sons v. Rensford, 185 Ala. 333, 64 So. 366.

As far as this record indicates, the trial court struck the first three grounds of the motion to quash simply on the statement of the Solicitor that "the State moves to strike the first three grounds of the motion [motion to quash the indictment]." The Solicitor did not explain the theory or theories on which he based his contention that those grounds of the motion to quash the indictment should be stricken.

But the fact that the State's motion to strike was oral should not work a reversal of this cause if in fact the grounds of the motion to quash the indictment which were stricken were without merit.

■ In considering the action of the trial court in striking the first three grounds of the motion to quash the indictment, the averments of those grounds must be taken as true as against the motion to strike. Standard Tilton Milling Co. v. Toole, 223 Ala. 450, 137 So. 13.

The first ground of the motion to quash is to the effect that the indictment is void because Aaron's arrest was illegal in that he was arrested by Montgomery County officers without a warrant and in the presence of "a mob of armed, threatening and abusive citizens."

■ Under the provisions of § 154, Title 15, Code 1940, an officer may arrest any person for a felony, although not committed in his presence, if he has reasonable cause to believe that the person arrested committed the offense. Devers v. Harris, 238 Ala. 610, 193 So. 110. See also Ex parte Rhodes, 202 Ala. 68, 79 So. 462, 1 A.L.R. 568. It is not averred that Aaron was not arrested for a felony or that the arresting officers did not have reasonable cause to believe that he was the person who committed the offense for which he was arrested. The mere fact, if it be a fact, that "a mob of armed, threatening and abusive citizens" were present at the time of the arrest would not affect the legality of the arrest.

Since the averments of the first ground of the motion to quash the indictment do not show an illegal arrest, it is unnecessary to pass on the question as to whether an indictment is subject to being quashed simply because the person indicted had been previously arrested illegally.

The second ground of the motion to quash is to the effect that the indictment is illegal because after his arrest, Aaron was held for approximately ten hours in the county jail of Montgomery County without being allowed to confer with counsel, parents, spouse, or friends and that he was thereafter transferred to Kilby Prison, a State penitentiary, where he remained for approximately forty-eight hours.

The third ground of the motion to quash the indictment is in substance that on June 29, 1959, two days after Aaron's arrest, he was returned to the county jail of Montgomery County where he remained for approximately eight days before he was taken before a magistrate.

■ We are aware of no state or federal decision which holds that an indictment by a grand jury of a state is subject to being quashed because the person indicted was held incommunicado after his arrest and was not taken before a committing magistrate promptly after his arrest by law enforcement officers. We are not advised of any statute of this state which requires a person arrested by an officer to be taken before a magistrate within any specified time after the arrest. Cf. § 160, Title 15, Code 1940, which relates to arrests by private individuals.

■ We hold that the first three grounds of the motion to quash the indictment were stricken without error in that they did not state grounds which called for the quashing of the indictment.

The fourth ground of the motion to quash the indictment is to the effect that the indictment was based "upon an alleged confession of guilt which same was extorted and illegally obtained from defendant herein under circumstances of extreme duress and by and through force and violence

or threats of force and violence, coercion, torture and brutality of officers of the County of Montgomery, and the State of Alabama, while acting in their official capacities, * * *"

The State took issue on this ground of the motion to quash the indictment. The record shows that the victim appeared before the grand jury and positively identified the defendant, Aaron, as being the man who raped her. After the appearance of the victim a confession was presented to the grand jury.

■ Even if it be conceded that the confession which was presented to the grand jury was obtained by force and duress to such an extent that it would not have been admissible in evidence in the trial of the case, it does not follow that its presentation to the grand jury renders the indictment void or subject to being quashed.

In Fikes v. State, 263 Ala. 89, 81 So.2d 303, 310, we said: "If legal evidence is given, we may add, an indictment is not subject to be quashed because there was illegal evidence also given." .

We do not understand the Supreme Court of the United States to have based its reversal of our judgment in the Fikes Case on the quoted statement. See Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246.

In Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 4, 54 L.Ed. 1021, the Supreme Court of the United States was called upon to decide whether an indictment should be quashed because procured in part by incompetent evidence of an admission by the accused, aside from which "there was very little evidence against the accused." That court refused to hold that such an indictment should be quashed, stating, "The abuses of criminal practice would be enhanced if indictments could be upset on such a ground."

In Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397, the Supreme Court of the United States said in part as follows:

"* * * If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321.

■ The trial court correctly refused to quash the indictment on the basis of the averments contained in the fourth ground of the motion to quash.

The "Motion for Appointment of Lunacy Commission" alleged, in part, that: "* * * due to the nature of the offense charged in the aforesaid indictment, and due to the conduct of the defendant, both before and since his apprehension, there is reasonable ground for believing the defendant insane either at the time of the commission of the alleged offense or presently; * * *" That motion prayed that the "Court," under the provisions of § 425, Title 15, Code 1940, appoint the Superintendent of the Alabama State Hospitals to make a written report to the "Court" as to "whether or not there is reasonable ground to believe the said defendant was insane either at the time of the commission of the offense alleged in the indictment, or presently."

The Solicitor took the position that the said motion was insufficient to invoke the provisions of § 425, Title 15, Code 1940, stating: "And if he is attempting this

under 425 I don't think he has any standing at all because he has to file a report of three doctors before he can proceed under that section."

The presiding judge did not rule on the position asserted by the Solicitor, but permitted counsel for defendant to amend the motion so as to include the provisions of § 428, Title 15, Code 1940, as well as the provisions of § 425 of that title.

Witnesses called by the defendant and by the State were examined in the presence of the presiding judge as to the mental condition of the defendant. At the conclusion of the hearing the motion was denied.

▮ Reversible error does not appear in the denial of the motion.

Section 425, Title 15, Code 1940, does not make it the duty of the presiding judge, upon application, to appoint "not less than three reputable specialist practitioners in mental and nervous diseases" or the Superintendent of the Alabama State Hospitals to examine a defendant charged with a capital offense and make a report as to his mental condition. The making of such appointments are within the discretion of the presiding judge. Campbell v. State, 257 Ala. 322, 58 So.2d 623, and cases cited.

Like construction has been placed upon § 428, Title 15, Code 1940. Reedy v. State, 246 Ala. 363, 20 So.2d 528.

▮ We do not think it improper to point out our disagreement with the position taken by the Solicitor to the effect that the initial application to the presiding judge for the invocation of the provisions of § 425, Title 15, Code 1940, must follow or be accompanied by "a report of three doctors" or by a report of the superintendent of the Alabama State Hospitals. Such a report is made only after the presiding judge appoints the "three doctors" or directs the superintendent to examine the defendant.

▮ When the trial on the indictment for rape was begun the court excluded from the court room all persons except the defendant, members of his family, and the officials of the court. The Constitution of this state has vested in our courts this exceptional discretion in cases of rape and assault with intent to ravish. 1901 Constitution, § 169; Wade v. State, 207 Ala. 1, 92 So. 101; Id., 207 Ala. 241, 92 So. 104; Scott v. State, 249 Ala. 304, 30 So.2d 689.

The evidence on behalf of the State is substantially as hereafter summarized.

Prosecutrix, a registered nurse, left her place of employment shortly after noon on Saturday, June 27, 1959. She went to the home of her aunt, where she had lunch and picked up her baby. She left her aunt's home, carrying her baby with her, at about 2:00 P.M. and arrived at her own home at approximately 2:15 P.M. Upon arriving at her home she unlocked the door which leads from the garage into a den. She reached into the den and obtained a baby stroller, in which she placed the baby. She left the den door open. She and the baby went to the front of the house where prosecutrix moved some water hoses.

While she was in front of the house prosecutrix could not see the door to the den. After about ten minutes prosecutrix carried the baby into the house through the den door. She placed the baby in a bed in the nursery. Prosecutrix then entered her own room where she changed from her nurse's uniform into a tailored shirt and a pair of shorts. She went back to the nursery and opened the door to a closet. A Negro man pulled her into the closet and a terrific struggle took place therein for approximately fifteen minutes. The man did not speak to prosecutrix while they were in the closet but he tried to choke her. He threw her on the floor of the closet and placed his foot on her neck. He did not have on shoes. She did not get a good look at the man before being pulled into the closet.

After a period of approximately fifteen minutes the closet door opened and prosecutrix and the man fell on the floor of

the nursery, where they fought for several minutes. The man tried to tie prosecutrix' hands together with a tie. He did not talk much, but during the struggle on the floor of the nursery he said: "I will kill you"—"Turn loose"—"Turn me loose."

The prosecutrix finally became exhausted and she was dragged out of the nursery across the hall into her own bedroom, where the man tied her hands together with a tie which she had never seen previously and tied her feet together with a tie which belonged to her husband. He threw a rug over her head, after trying to "cram" into her mouth one of the brown cotton gloves which he was wearing. The man then went into the kitchen where he drank some water. He returned to the prosecutrix and again tied her hands, this time with a coat hanger. He did not remove the tie which he had previously placed around her hands or wrists. He ripped the telephone extension from the wall.

After returning from the kitchen the man untied prosecutrix' legs, removed her underclothing and shorts and raped her. After completing the sexual act the man put the victim's underclothing and shorts back on her and removed the tie from her wrists, but left her hands tied with the coat hanger. He went into the kitchen and drank some more water. Within a short time he left the house by way of the den door.

After the prosecutrix felt reasonably certain that the man had left her home, she called her husband and law enforcement authorities and reported that she had been raped. She used a phone in the den which had not been affected by the disconnection of the phone in the bedroom. Prosecutrix' husband and the authorities arrived at the scene of the crime within a few minutes, as did the physician for whom the prosecutrix worked.

This physician examined prosecutrix at her home and again in the hospital. He testified that when he arrived at her home prosecutrix was lying on the bed, completely exhausted in a state of shock. Her face and neck were discolored and blue and covered with scratches. Her neck was swollen. Her arms were scratched and discolored. There were bruises on her shoulders and on her shins and there were scratches on her lower legs and upper chest. Both lips were bleeding from a crush type injury. Two teeth were loose. This doctor also related the result of an examination which he and a specialist in gynecology made at the hospital. They found multiple scratches and bruises all over the body. They made an examination of her pelvic organs. There were injuries as evidenced by small tears in the posteria vaginal wall and posteria fourchette. A "bloody tinged fluid" was found in the vagina. Human spermatozoa were found. This doctor said that he saw no mobility of spermatozoa, but the gynecologist who also testified stated that he did find mobile spermatozoa and the latter expressed the opinion that sexual intercourse had occurred within a few hours prior to the examination of the prosecutrix.

Within a short time after the assailant left the home of the prosecutrix, "bloodhounds" were put upon his tracks. The dogs left the premises of the prosecutrix "as if trailing" and went northward to a point approximately one mile distant. The place where the dogs quit "trailing" or "tracking" is a clearing in a wooded area adjacent to a graveled country road. The clearing had been used as a trash dump and as a "turnaround" for motor vehicles.

Two officers in an automobile proceeded ahead of the dogs on a road which runs north and south a short distance east of the trail followed by the dogs. As these officers moved in a northerly direction ahead of the dogs they observed an automobile parked in the clearing referred to above. The automobile was backed into the road the officers were traveling. It was then driven in a northerly direction at a very fast rate of speed. The officers gave pursuit and finally succeeded in stopping the automobile. The defendant, Drewey Aaron, was alone in the automobile. He was arrested and carried to the home of the prosecutrix. He

was placed in a line-up along with several other Negro men. The prosecutrix, however, failed to identify any of the men in the line-up as her attacker.

On July 7, 1959, the day on which the preliminary hearing was held, prosecutrix saw the defendant in the jail at the Montgomery County Courthouse and was given an opportunity to hear him repeat the statement which she said her assailant made while they were fighting on the floor of the nursery. On that occasion prosecutrix identified Drewey Aaron as the man who raped her. On the trial below the prosecutrix said she was positive as to her identification of defendant because of his voice, although she again stated that she could not make a positive "visual" identification.

The shirt, trousers and socks worn by Aaron at the time of his arrest were identified by prosecutrix as having been worn by her assailant.

Small pieces of wallboard found in the trousers which Aaron had on at the time of his arrest were shown to be similar to the wallboard in the closet where prosecutrix and her assailant fought. The wallboard in the closet was broken and shattered during the fight.

The defendant produced only one witness whose testimony tended in any wise to establish an alibi. Frances McLemore, a Negro woman, said she saw Aaron enter the Red Top Cafe in Montgomery at about 2:15 P.M. on the afternoon the crime was committed and that he remained there until about 3:30 P.M. Two other witnesses called by the defendant said that they saw him on the day of the crime but not after 1:00 P.M.

■ The question of identification was entirely one of fact for the jury. The jury saw and heard the witnesses as to identification and as to the alibi and it was for the jury to determine the weight to be given to the testimony.

The defendant clearly established that his mother died in an insane institution to which she had been committed. He called several nonexpert witnesses for the purpose of showing that he was insane. One of them, Mitchell Whitfield, said that defendant was "partly insane" but that he was not crazy—was not violent. The defendant's sister, Willie Mae Reese, said that "he ain't got good mind, his mind bad, got a bad mind." The defendant's foster mother said that the defendant was "not normal like he should be" and frequently complained of pains in his head and side. Another sister testified that she did not think the defendant had "his right mind."

The State called an expert in mental diseases, who had examined the defendant and based on his examination this witness expressed the opinion that the defendant was sane—that he could distinguish between right and wrong and could adhere to the right. A number of people who were shown to have been closely associated with the defendant expressed the opinion that he was sane. Among those so testifying were people under whom the defendant had worked as a truck driver and delivery man.

■ As excuse for the crime the burden was on the defendant to clearly prove to the reasonable satisfaction of the jury that he was so afflicted by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong; and the crime must have been the product solely of such diseased mental condition. Nichols v. State, 267 Ala. 217, 100 So.2d 750; Smarr v. State, 260 Ala. 30, 68 So.2d 6; Lakey v. State, 258 Ala. 116, 61 So.2d 117, and cases cited; Parsons v. State, 81 Ala. 577, 2 So. 854.

■ The issue, therefore, of insanity as excuse for the crime was for the determination of the jury. This issue was determined adversely to the defendant. We think the verdict was well founded.

■ There was no error in admitting into evidence an aerial photograph of the home of the prosecutrix and surrounding territory. The evidence shows that the photograph is a true and correct picture of the area included and that it reflects the true condition on the ground. It furnishes a better understanding of the trail followed by the "bloodhounds" and of the roads traveled by the officers in pursuit of the rapist. Wise v. City of Abilene, Tex.Civ. App., 141 S.W.2d 400; 9 A.L.R.2d 928; Frankfurt v. City of Dallas, Tex.Civ.App., 299 S.W.2d 722; Williams v. Neddo, 66 Idaho 551, 163 P.2d 306. See 2 Belli, Modern Trials, § 240, p. 1192; Scott, Photographic Evidence, § 628, p. 515; 57 A.L.R. 2d 1351.

■ Photographs of the interior of prosecutrix' home were properly admitted in evidence. These photographs, taken within a very short time after the crime, were shown to accurately portray the conditions which existed immediately after the crime. They tended to elucidate and explain material facts under inquiry. Hines v. State, 260 Ala. 668, 72 So.2d 296; Wilson v. State, 256 Ala. 12, 53 So.2d 559; Pilley v. State, 247 Ala. 523, 25 So.2d 57; Reedy v. State, 246 Ala. 363, 20 So.2d 528.

■ Pictures of the prosecutrix taken within one or two hours after the crime were admitted without error. They tended to illustrate the gravity of the assault. Reedy v. State, supra, and cases cited.

■ It was not improper to permit a physician to point out on the photographs of the victim certain places as depicting the injuries which he saw at the time he examined her within a few minutes after the attack. Jackson v. State, 260 Ala. 641, 71 So.2d 825.

■ A shirt, a pair of trousers, a pair of gloves and a pair of socks, all of which the prosecutrix identified as having been worn by her attacker, were admitted in evidence without error. All of those articles except the gloves were in possession of defendant at the time of his arrest. The gloves were found near a road which the defendant traveled in an automobile while being pursued by the officers. Vaughn v. State, 235 Ala. 80, 177 So. 553; Thomas v. State, 257 Ala. 124, 57 So.2d 625. The fact that the shirt, trousers and socks were taken from the defendant by officers did not render them inadmissible. Thomas v. State, supra; Ex·parte City of Mobile, 251 Ala. 539, 38 So.2d 330; Myhnd v. State, 259 Ala. 415, 66 So.2d 544.

■ The tie and the coat hanger wire identified as having been used by the rapist to tie his victim's hands were admitted in evidence without error. The tie was shown to have bloodstains on it. Smith v. State, 253 Ala. 220, 43 So.2d 821.

■ A blouse which the prosecutrix said she was wearing at the time of the attack was properly in evidence. The blouse was dirty and torn. Several buttons had been ripped off. Prosecutrix testified that the blouse was clean and in perfect order before the attack. Smith v. State, 248 Ala. 363, 27 So.2d 495; Fowler v. State, 36 Ala. App. 385, 56 So.2d 687.

■ As indicated above, the walls of the closet in which prosecutrix and her attacker fought were broken and shattered as a result of the fight. A piece of the wallboard was introduced in evidence, as were several small pieces of material found in the defendant's trousers after his arrest, which the evidence shows were of the same material as the wallboard. These articles tended to show defendant's presence in the closet and were, therefore, properly admitted in evidence. Smith v. State, 247 Ala. 354, 24 So.2d 546. The fact that the small pieces of wallboard were recovered from defendant's trousers without his express consent and without the defendant being advised that the result of an examination of his personal effects might be used against him does not affect the admissibility in evidence of the small pieces of material. Ex parte City of Mobile, 251 Ala. 539, 38 So.2d 330.

Several photographs of the defendant were taken in the Montgomery County jail by a State toxicologist within a few hours after the crime. They showed the clothing he wore at the time of his arrest and cuts and abrasions on his hands and feet. The State offered those photographs in evidence without showing that they were made with the defendant's consent. The defendant objected to their introduction on the grounds that the defendant would thereby be deprived of rights, privileges and immunities guaranteed to him by § 6 of Article 1 of the Constitution of Alabama and by the Fifth and Fourteenth Amendments to the Constitution of the United States. The defendant's objections were overruled and the photographs admitted.

The provisions of the Fifth Amendment to the Constitution of the United States are not applicable to proceedings in state courts. Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903; Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97. And in the case just cited it was held that self-incrimination is not protected as violative of due process under the Fourteenth Amendment to the Constitution of the United States.

Section 6 of Article 1 of the Constitution of this state provides, in part, that an accused "shall not be compelled to give evidence against himself." This provision has been construed as protecting a person from being required against his will from doing any positive act tending to operate as evidence against himself in a criminal case. But it does not violate this rule for another person to do an act against the will of the defendant which relates to his person, and thereby cause to be revealed matter material as evidence against him. Hunt v. State, 248 Ala. 217, 27 So.2d 186.

Here the defendant was not required to do a positive act in connection with the photographs. The photographs can be likened to an examination of the person of a defendant, the results of which are admissible in evidence even though made without consent. Spicer v. State, 69 Ala. 159; Banks v. State, 207 Ala. 179, 93 So. 293, 24 A.L.R. 1359; Myhand v. State, supra. The opinion in the case of Hunt v. State, 248 Ala. 217, 27 So.2d 186, is a complete answer to the objections interposed by defendant to the introduction in evidence of the photographs of defendant, although it did not deal specifically with the matter of photographs.

In Brown v. State, 229 Ala. 58, 155 So. 358, we pointed out that the record showed that no threats were made against or inducements offered to the defendant to permit the taking of his photographs. This observation was but an accurate statement of the circumstances prevailing in that case concerning the taking of the photographs and was not intended to be a holding that the burden is on the State to present preliminary proof that a defendant voluntarily consented to having his picture taken. Burks v. State, 240 Ala. 587, 200 So. 418.

In State v. Linebarger, 71 Idaho 255, 232 P.2d 669, the record did not show that the defendant's permission to take his picture was requested or that he made any objection to being photographed. The defendant contended that the introduction of the photograph taken of him two days after the rape at the sheriff's office violated his constitutional immunity from self-incrimination. The Supreme Court of Idaho held that contention to be without merit. To like effect see Housewright v. State, 154 Tex.Cr.R. 101, 225 S.W.2d 417; State v. Johnson, Mo., 286 S.W.2d 787; Shaffer v. United States, 24 App. D.C. 417, certiorari denied 196 U.S. 639, 25 S.Ct. 795, 49 L.Ed. 631; United States v. Amorosa, 3 Cir., 167 F.2d 596.

We hold that the court did not err to a reversal in admitting the photographs of the defendant in evidence.

During the direct examination of the witness who had charge of the "bloodhounds" he testified as to the manner

in which the dogs tracked, the trail they followed and the place where they stopped tracking. He was then asked the following question and gave the following answer:

> "Q. Now, what significance did you attach to the fact your dogs stopped there, what conclusions do you draw from that?

> "A. Well, the man got off the ground there, he rode off or something."

The cause moving the dogs to abandon the trail was a matter of deduction from all the facts and circumstances in evidence, carefully weighed and considered, and was not a fact to which a witness can testify. Witnesses are not allowed to reason to a jury. There is no basis for a distinction between expert witnesses and others which would take even experts out of the general rule against drawing out reasons which conduce to an act or omission to which they depose. Richardson v. State, 145 Ala. 46, 41 So. 82. In the case last cited we reversed because the court permitted the introduction of a statement very similar to the one with which we are dealing here.

It was not error to permit the State Toxicologist to testify that he found on the shirt which was introduced in evidence and identified as having been worn by the defendant at the time of his arrest, calcium sulphate or gypsum similar to some of the material of which the closet wallboard was made.

It was not error to permit State Toxicologist Pruitt to testify that in his opinion the scratches or cuts which he observed on the ankle of the defendant were "consistent with fingernail scratches." Perry v. State, 87 Ala. 30, 6 So. 425; Curry v. State, 23 Ala.App. 140, 122 So. 303.

Over objection of counsel for defendant, the State was permitted to ask the defendant's character witnesses on cross-examination as to whether they "ever heard" that "about four years ago" the defendant raped his fourteen-year-old niece and that prior to that he tried to rape one Ruby Moore.

Where a witness testifies as to the general reputation or character of the defendant, the knowledge of the witness as to such reputation or character may be tested on cross-examination by asking him if he had heard of the defendant being charged with other offenses or of specific acts of bad conduct on the part of the defendant. Helms v. State, 254 Ala. 14, 47 So.2d 276; Kervin v. State, 254 Ala. 419, 48 So.2d 204; Johnson v. State, 260 Ala. 276, 69 So.2d 854. The better practice is to frame the question so as to inquire of the witness if he had heard of such occurrence prior to the commission of the offense for which the defendant is on trial. Ragland v. State, 178 Ala. 59, 59 So. 637.

In any event, no prejudicial error resulted to the defendant from this line of questions asked his character witnesses on cross-examination. Each of the witnesses so cross-examined answered that he or she had not heard of any such conduct on the part of the defendant. Johnson v. State, supra.

The State did not introduce a confession in the trial of this case. Consequently the fact, if it be a fact, that the wife of the defendant was not permitted to see him during the time he was confined in Kilby Prison shortly after his arrest had no bearing on the issues in this case and the trial court did not err to a reversal in refusing to permit the defendant to make proof of his wife's inability to see him during that period of time.

The writer and Justices STAKELY and COLEMAN are of the opinion that the testimony as to the identity of the defendant based on the enforced repetition by the defendant of words alleged to have been used at the scene of the crime was inadmissible and highly prejudicial. They entertain the view that such evidence violated the right

guaranteed to the defendant by § 6 of the Constitution of this state not to be "compelled to give evidence against himself," for the conclusion of the prosecutrix of defendant's identity was based almost exclusively on this enforced conduct of the defendant. Beachem v. State, 144 Tex.Cr.R. 272, 162 S.W.2d 706; State v. Taylor, 213 S.C. 330, 49 S.E.2d 289, 16 A.L.R.2d 1317. The Texas constitutional provision against self-incrimination is identical with that of this state. See 27 North Carolina Law Review 262; 24 Indiana Law Journal 587; 1 Vanderbilt Law Review 250.

The defendant was not merely required to speak; he was compelled to repeat certain specific words or phrases which the prosecutrix had told the officials her assailant used during the course of the attack. The South Carolina and Texas cases specifically condemn this practice. Cf. Seals v. State, post p. 142, 122 So.2d 513.

The deputy sheriff who had the defendant in custody at the time the defendant repeated the words said that after talking to the defendant "for some time" he, the deputy sheriff, "asked him to repeat some things after me." This deputy further stated: "I didn't tell him he had to. He asked me if it was a trick, and I told him no, I wasn't trying to trick him." That officer did not explain why he wanted the defendant to repeat the words or tell him that the prosecutrix was stationed at a point where she could hear him as the words were repeated. No other person was present so as to constitute a line-up. The aforementioned Justices are of the opinion that the defendant in effect objected to repeating the words if to do so would enable the prosecutrix to identify him and the deputy sheriff, by his conduct and remarks, in effect denied the presence of the prosecutrix and indicated that the defendant was not being asked to repeat the words so as to enable her to identify him. Under the circumstances prevailing, they are unwilling to say that the defendant was not compelled to repeat the words or phrases.

However, LIVINGSTON, C. J., and SIMPSON, GOODWYN and MERRILL, JJ., are clear to the conclusion that the record in this case, when construed in the light most favorable to the defendant, does not show that he was "compelled" to give evidence against himself. Consequently, they do not express any view concerning the right of the State to compel a prisoner to repeat in the presence of the prosecutrix certain specific words or phrases which the prosecutrix contends were uttered by her assailant.

The writer and Justice STAKELY entertain the view that the admission in evidence of that part of the hospital record which contained details of the attack upon the prosecutrix as related by her to the hospital authorities constituted reversible error. This court has held many times that in a prosecution for rape the State may show that the prosecutrix made a complaint of having been raped, but that the State cannot show on direct the details of the occurrence as related by the prosecutrix in her complaint. Hall v. State, 248 Ala. 33, 26 So.2d 566, and cases cited. The details of the crime contained in the hospital report obviously do not pertain to the treatment of the prosecutrix and cannot be said to be admissible under the provisions of § 415, Title 7, Code 1940. Anderson v. State, 35 Ala.App. 111, 44 So.2d 266. See McElroy, The Law of Evidence in Alabama, § 254, pp. 103–104; 144 A.L.R., p. 731; Commonwealth v. Harris, 351 Pa. 325, 41 A.2d 688.

LIVINGSTON, C. J., and SIMPSON, GOODWYN, MERRILL and COLEMAN, JJ., do not agree that reversible error is shown in this connection. They express no view as to the admissibility of the hospital report in its entirety. They take the position that reversible error is not shown even if it be conceded that the hospital record was not admissible in its entirety because it contained the details of the crime as related by the prosecutrix to the hospital authorities upon her admittance because counsel for the defendant expressly consented to the admission of the

hospital report, saying: "We have no objection as such to the introduction of these hospital records for the limited purpose set out by Your Honor earlier." The court had previously ruled that he would permit the State to show that prosecutrix was carried to a hospital after the attack upon her "to show force that was used, if force was used."

Because of the conclusion of the witness who handled the bloodhounds that, "Well, the man got off the ground there, he rode off or something," the judgment of the trial court is reversed and cause is remanded.

Reversed and remanded.

LIVINGSTON, C. J., and SIMPSON, STAKELY and COLEMAN, JJ., concur.

SIMPSON, Justice (concurring specially).

I concur in the opinion to reverse for the introduction of the bloodhound testimony on authority of the Richardson case, supra, reported in 145 Ala. 46, 41 So. 82. I entertain grave doubt of the soundness of that case, but in view of the fact that it has been long standing without any challenge as to its legal soundness, I am unwilling to undertake to persuade the court to overrule it in such a case (death) as this case.

GOODWYN and MERRILL, JJ., dissent as shown by the following:

MERRILL, Justice (dissenting).

I would affirm the judgment of the circuit court.

The majority reverses on one question and answer taken from the testimony of Clyde Carpenter, the "dog warden" at Kilby Prison, a witness for the state. The question and answer held to constitute reversible error read:

"Q. Now, what significance did you attach to the fact your dogs stopped there, what conclusions do you draw from that?

"A. Well, the man got off the ground there, he rode off or something."

Shortly thereafter, the following occurred:

"Q. You say at that point here where you marked the red 'X' on the map is where they lost their scent?

"A. That's right.

"Q. That is the point at which the person they were tracking seemed to have gotten off the ground and left no scent?

"A. That's right."

Then, on cross-examination, the following occurred:

"Q. I believe you said on the Stand further that based on your knowledge of hounds you then assumed the person was no longer on foot?

"A. That's right.
*   *   *   *   *   *

"Q. And you assume at that spot the person they were trailing was no longer on foot?

"A. That's right."

Since there was no objection to any of this testimony, I have listed all the evidence in the record pertaining to this point. I think a fair interpretation of this evidence is that the dogs lost the scent of the person they were tracking because he got off the ground at this particular spot. He had already testified that the scent of a person settles along the ground or on anything he touches and remains there for several hours and he also testified that the dogs did not ever lose a trail "unless a man gets on something or gets off the ground."

Under the automatic appeals statute, this evidence to constitute reversible error must have been "seriously prejudicial to the rights of the appellant."

I am unable to see any prejudice. The only possible damage this testimony could have done to appellant was to place him in

the area from whence a car was seen to back out. Before the dog warden had testified to any of the quoted testimony, he had already said that the dogs had followed the trail from the home of prosecutrix "back into this area where the car was parked."

The undisputed evidence shows that Deputies Lifford and Stearns saw an automobile back out from the spot where the dogs lost the scent, drive away, and they followed in hot pursuit for one and seven-tenths miles, that the vehicle was overtaken and stopped, and it was being driven by defendant, the only occupant of the car. It was also undisputed that they showed the "dog warden" the spot where the car had backed out of the clearing, which was the same place where the dogs lost the scent.

Thus, we see that the same inference that appellant was in this particular area comes from other competent evidence, which was also undisputed, and appellant could not have been seriously prejudiced by the question and answer even though it be conceded, which I do not, that they were not proper. Our statute says that "the judgment of conviction must not be reversed because of error in the record, when the court is satisfied that no injury resulted therefrom to the defendant." Tit. 15, § 389, Code 1940.

The majority opinion rests exclusively on the case of Richardson v. State, 145 Ala. 46, 41 So. 82, 83. There, the question was "Why did the dogs quit and leave the trail and go out into the field?" The trial court sustained the objection saying "that the witness could not testify as to why they did so, unless the witness was thoroughly acquainted with their habits and training." Without another question, the witness stated: "From what I know of these dogs, I would say that the reason the dogs quit the trail and went out into the field was because there was a body of men out in front, and the dogs *expected* to find the person they had been trailing." (Emphasis supplied.)

The original record has been examined, and it shows no other proceedings between the observation of the trial judge and the answer of the witness. Since there was no showing that the witness was "thoroughly acquainted" with the dogs' habits and training after the objection was sustained, it is certain that the words "From what I know of these dogs" did not qualify him as an expert. The trial court should have excluded the answer of the witness. It is elementary that a nonexpert witness should not be permitted to give his opinion in the usual case, the question of insanity excepted. 6 Ala.Dig., Criminal Law, ☞ 448(1); 9 Ala.Dig., Evidence, ☞471(2).

Moreover, I think there is a valid distinction in the statements made by the witnesses in the two cases. There, the witness testified as to what the *dogs expected* to find off the trail. This was obviously objectionable. It was his conclusion as to the dogs' conclusion, if such they can have. Here, the dog warden merely stated in effect that the dogs stopped because the scent was lost and the man must have gotten off the ground at that spot. And the only inference from the undisputed evidence is that the man did drive away from that spot by himself in an automobile.

In the Richardson case, the court said: "The witness could not know why the dogs went into the field." Then further, it was said:

"* * * It may be the opinion given as to the reason why the dogs left the woods and went into the field where the men were was derived from facts within the knowledge of the witness, but the facts were not disclosed. He would no doubt have been allowed to state any facts within his knowledge from which the jury might have inferred the abandonment of the trail was induced by an expectation that the person sought would be found among the crowd of men in the field, but the inference must be drawn by the jury. The witness could not properly be allowed to substitute himself for the jury, and to draw and state the conclusion in their place and stead."

Thus, we see that the Richardson case was devoid of any disclosed facts that supported the "reason why the dogs left woods and went into the field." But here, we do have facts to show the reason the dogs stopped at the place they did. The undisputed evidence shows that the dogs came to a certain place and stopped; they never lost a trail "unless a man gets on something or off the ground;" that the trail led to "this area where the car was parked," that the car backed out of this dead-end area, was followed and pursued, and the defendant was driving the car, and the witness was taken to the area and shown where the car had backed out. These facts · were ample to take this case out of the rule of Richardson v. State, 145 Ala. 46, 41 So. 82.

Finally, it has always been my understanding that a witness, of special knowledge or skill on a subject outside the ordinary realm of human experience, could state his inference from facts observed by him, as to matters connected with his specialty. The dog trainer testified that he had been training and handling bloodhounds to trail men for twenty years, that the dogs he used were highly trained dogs, that the dogs struck a trail at the back door of the home of the prosecutrix, and followed it until they came to the dead-end road and stopped. (This was the identical place from which other witnesses saw defendant back his car from and gave chase.) The dog trainer's conclusion that "the man got off the ground there, he rode off or something" was merely his own opinion based on stated facts concerning a matter outside the ordinary realm of human experience as to matters connected with his specialty.

In Watson v. Hardaway-Covington Cotton Co., 223 Ala. 443, 137 So. 33, 34, this court said:

"The fact that a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper. The general rule that a witness should narrate the evidence, give the facts, details, and circumstances, and let the jury from the opinion draw the conclusions from the testimony, is subject to an exception where the subject involves the opinion of an expert. He may base his answer on actual knowledge of the fact or on a proper predicate informing him of the fact or condition. It is unnecessary to reproduce the recent decisions on this question, or restate the well-understood rule. Penton v. Penton, 223 Ala. 282, 135 So. 481; Jones v. Keith, 223 Ala. 36, 134 So. 630; Yates v. Barnett, 215 Ala. 554, 112 So. 122; Burton & Sons v. May, 212 Ala. 435, 103 So. 46; Oden-Elliott Lumber Co. v. Daniel-Gaddis Lumber Co., 210 Ala. 582, 98 So. 730; Sloss-Sheffield S. & I. Co. v. Reid, 184 Ala. 647, 64 So. 334; Harbison-Walker Refractories Co. v. Scott, 185 Ala. 641, 64 So. 547; Williamson Iron Co. v. McQueen, as Adm'r, 144 Ala. 265, 40 So. 306; Choate v. Southern Ry. Co., 119 Ala. 611, 24 So. 373; Hood v. Disston & Sons, 90 Ala. 377, 7 So. 732."

And in Kirkland v. State, 21 Ala.App. 348, 108 So. 262, it was held that where the inquiry relates to a conclusion to be drawn from knowledge of facts depending upon professional or scientific skill or knowledge, experts may testify to conclusions as the best evidence.

For all or any of these reasons, I find no reversible error in the admission of the dog warden's testimony, and I, therefore, dissent.

GOODWYN, J., concurs.